CHAPMAN et al., Appellants,

v.

ADIA SERVICES, INC., Appellee.

[Cite as *Chapman v. Adia Services, Inc.* (1997), 116 Ohio App.3d 534.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–961020.

Decided Oct. 17, 1997.

536

*Wood & Lamping, Harold G. Korbee* and *Amy Gasser Callow,* for appellants Mitzi M. and Richard S. Chapman.

*Frost & Jacobs* and *David T. Croall,* for appellee.

PAINTER, Presiding Judge.

We are asked to answer a simple question: Does Ohio law allow a person to be fired solely for consulting an attorney? We answer no. The courthouse door must be open to the people of Ohio, and they may enter without fear of being deprived of their livelihood.

We have put the question in simple terms. Of course, the facts of the case are not simple. But the procedural posture of the case mandates that we consider the facts in the light most favorable to the plaintiff-appellant. Although a jury may or may not find the facts to be as she alleges, or may find an overriding justification for her termination, she is entitled to have her case heard.

The trial court granted summary judgment against appellant.[1] We reverse the judgment and remand the case for trial.

---

1. We *sua sponte* remove this case from the accelerated calendar.

## I. After the Fall

Mitzi Chapman, the plaintiff-appellant, began working for Adia Temporary Services, the defendant-appellee, in 1986. During the nine years of her employment with Adia, she received outstanding work evaluations and eventually became senior branch manager of the Tri–County office. Chapman was paid on a commission basis, which was based on a percentage of the profits that her office generated, and a salary. Under Chapman's management, the Tri–County office became one of the highest-rated offices in the country for profitability. As a result, Chapman was one of the top earners in the company. One of the contributing factors to the success of the Tri–County office was the Procter and Gamble ("P & G") account. P & G was one of Adia's largest clients, and Chapman handled the P & G account.

On October 4, 1994, Chapman was on a work-related visit at P & G when she slipped and fell. She sustained serious, permanent knee injuries that required surgery. As a result of her injuries, Chapman decided to consult with an attorney to discuss the merits of a claim against P & G. On June 1, 1995, her attorney sent a letter of inquiry to Doug Henry, Chapman's contact at P & G, requesting a copy of any accident or investigatory reports that were made as a result of Chapman's fall.

Henry, in turn, contacted Teri Rehmet, a P & G employee who was responsible for working with vendors like Adia, about the letter of inquiry. Rehmet agreed to investigate the situation with Adia.

Rehmet was concerned that if Chapman brought a legal action, a conflict of interest would occur between Chapman and P & G. She decided that if Chapman were instituting a suit, it would be best to have her removed from the P & G account. Rehmet called Adia's regional vice president, Mary Lou Rimsky. Rimsky informed Rehmet that she did not believe that Chapman was bringing suit, but agreed that if Chapman did file a claim, Adia would remove her from the P & G account. In response to Rehmet's call, Rimsky called Mark Steele, vice president and general manager of Adia's central region. They decided to remove Chapman immediately from the P & G account and to place her on a paid leave of absence. Later that day, Rimsky and Steele met with Chapman and informed her of their decision.

Adia did not formally contact Chapman for almost a month. However, Rimsky informed Chapman that she could pick up her personal items from the Tri–County office on July 1, 1995. When Chapman and her husband arrived on that Saturday to collect her personal belongings from the Tri–County office, Rimsky was there. Chapman asked her husband to take some photographs of a wall on which several of Chapman's awards were hanging. Rimsky became upset at Chapman and her husband and refused to let them take any photographs.

Rimsky also allegedly threatened to throw Chapman's husband's camera down the hall. When Chapman attempted to stop her, Rimsky allegedly scratched her arm. Chapman reported the altercation to the Sharonville police, but no further action was taken by Chapman or the police.

Then, on July 14, 1995, Chapman received a letter from John Wilson, Adia's corporate vice president in charge of human resources. Wilson's letter informed Chapman that her new assignment was to start up a Clermont County branch. This assignment was made despite the fact that, in 1992, Rimsky documented that relocating Chapman to a new Clermont County branch would not be practical. Rimsky stated that it would not be practical because it did not make sense to put someone with six years of experience in an office with one person to manage and with low hours. The letter also informed Chapman that her commission would be calculated on the same basis that it had been at the Tri–County office until June 30, 1995. Chapman rejected the offer with a letter from her attorney that stated the proposed new position was an unreasonable and an unacceptable demotion that constituted a constructive termination. Chapman's attorney's letter also informed Adia that he was providing an opportunity for Adia to take corrective action.

Thereafter, Wilson again attempted to persuade Chapman to start up a Clermont County branch and also offered her the option of replacing the existing branch manager at the Florence, Kentucky branch. Wilson then assured Chapman that her commission would be calculated on the basis it had been at the Tri–County office until December 30, 1995. Therefore, Chapman would not incur a substantial pay cut for the balance of 1995. Wilson informed Chapman that Adia expected her to report to her new position on July 24, 1995. Chapman rejected both of these offers because she may have been forced to take a substantial pay cut after 1995, when her compensation would be calculated based on the profitability of the new office. Additionally, Chapman objected to the longer commute to work and to working at a desk next to Rimsky until the development of the Clermont County branch was completed.

Chapman did not report to any Adia office on July 24, 1995. Chapman's attorney informed Adia that Chapman considered herself constructively terminated. She remained unemployed until November 1995.

In October 1995, Chapman filed suit against P & G for damages from the personal injuries sustained when she slipped and fell while at P & G and for tortious interference with Chapman's business relationship with Adia. Chapman also filed a wrongful-discharge claim against Adia, and Chapman's husband asserted a loss-of-consortium claim against both P & G and Adia. P & G reached a settlement with the Chapmans and is not a party to this appeal.

After thorough discovery, both Adia and Chapman moved for summary judgment. The trial court denied Chapman's motion, but granted Adia's motion in its entirety on the wrongful-discharge claim. The trial court determined that, when an employer terminates an employee for consulting an attorney regarding the merits of a claim that affects the employer's business, Ohio public policy is not violated.

In a sole assignment of error, Chapman challenges the trial court's grant of Adia's motion for summary judgment and argues that (1) Ohio public policy protects the rights of an employee to consult an attorney regarding the merits of a claim that affects the employer's business without fear of retaliation, and (2) summary judgment in favor of an employer is improper when an employee presents sufficient evidence of a wrongful and constructive termination.

## II. Public-Policy Exception

Chapman first argues that summary judgment in favor of Adia was inappropriate because Adia violated Ohio public policy by terminating her for consulting an attorney regarding a possible claim against P & G.

Our review of a summary judgment is de novo. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 30 OBR 78, 506 N.E.2d 212; *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 641 N.E.2d 265. Under Civ.R. 56(C), a motion for summary judgment is properly granted if the court, upon viewing the evidence in a light most favorable to the party against whom the motion is made, determines that (1) there are no genuine issues as to any material facts, (2) the movant is entitled to a judgment as a matter of law, and (3) the evidence is such that reasonable minds can come to but one conclusion and that conclusion is adverse to the opposing party. See *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 639 N.E.2d 1189; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274. We must determine whether the trial court properly granted summary judgment in favor of Adia on Chapman's claim of wrongful termination.

Adia contends that Chapman was not fired because she consulted a lawyer (contending, also, that the actions did not amount to termination), but because she might bring a lawsuit. We perceive no difference. Chapman contends that she consulted counsel only to determine whether she had a legal claim—no lawsuit may have even been filed at all. We also discern no difference between these characterizations. Strangely enough, this lawsuit ensued *because of* Adia's actions. Thus, this matter escalated from a possible "slip and fall" case against Adia's customer to a slip-and-fall *and* a "tortious interference" claim against the customer (both now settled) *and* this case. Whatever the merits of the original slip-and-fall case, the reaction to it created a slippery slope indeed.

■ Chapman was working without a contract for employment; therefore, she was an at-will employee. Under the employment-at-will doctrine, employers may terminate an at-will employee at any time—for any reason or for no reason at all—as long as the termination is not contrary to law. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150. However, the Ohio Supreme Court has carved a public-policy exception out of this bright-line rule in *Greeley v. Miami Valley Maintenance Contr., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981. The *Greeley* court stated that "the right of employers to terminate employment at will for 'any cause' no longer includes the discharge of an employee where the discharge is in violation of a statute and thereby contravenes public policy." *Id.* at paragraph two of the syllabus.

■ The Ohio Supreme Court has further opened the door for public-policy exceptions: " 'Clear public policy' sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law." *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, paragraph three of the syllabus. This broadening of the public-policy exception has left the determination of the extent of the exception to the courts of this state.

The Ohio Supreme Court has adopted Professor Henry H. Perritt, Jr.'s analysis of the elements of wrongful termination in violation of public policy to facilitate the appraisal of whether an at-will employee has a viable cause of action. *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 652 N.E.2d 653. According to Professor Perritt, the elements of wrongful termination are as follows:

" '1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

" '2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

" '3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

" '4. The employer lacked [the] overriding legitimate business justification for the dismissal (the *overriding justification* element).' (Emphasis *sic.*)" *Id.* at 69–70, 652 N.E.2d at 657–658, quoting Perritt, The Future of the Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398–399.

■ The clarity and the jeopardy elements are questions of law and policy to be determined by the court. *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 151, 677 N.E.2d 308, 321, citing *Collins v. Rizkana,* 73 Ohio St.3d at 70, 652 N.E.2d at 658. The causation and overriding-justification elements are questions of fact to be determined by the trier of fact. *Id.* Thus, given the procedural posture of the case at bar, we first consider the clarity and jeopardy elements before determining whether Chapman presented sufficient evidence on the causation and justification elements to survive a motion for summary judgment.

■ Turning to the clarity element, we are able to identify at least three sources of public policy that encourage employees to consult an attorney about possible claims that would affect the employer's business interests—the Ohio Constitution, the Code of Professional Responsibility ("CPR") as adopted by the Ohio Supreme Court, and common law. First, Section 16, Article I of the Ohio Constitution provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law * * *." The framers of the Ohio Constitution inserted that provision, and we believe that they meant what they wrote. A remedy would be illusory if citizens could lose their jobs for seeking it.

In addition, the Ohio Constitution gave the Ohio Supreme Court the authority to adopt the CPR in 1970. The CPR contains two provisions which help to convince us that encouraging individuals to consult an attorney is a clear public policy in Ohio. EC 1–1 states that "every person in our society should have ready access to the independent professional services of a lawyer of integrity and competence." EC 2–1 states:

"The need of members of the public for legal services is met only if they recognize their legal problems, appreciate the importance of seeking legal assistance, and are able to obtain the services of acceptable legal counsel. Hence, important functions of the legal profession are to educate laymen to recognize their legal problems, to facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available."

We refuse to engraft upon the CPR the caveat "however, if a claim is against the potential client's employer, the attorney must advise the client that she might lose her livelihood simply for consulting the attorney."

The third identifiable source of public policy that encourages employees to consult an attorney about possible claims that would affect their employer's business interests is the common law. The United States Supreme Court has concluded that, in order for a private citizen to obtain redress, the claimant must be able to obtain adequate legal representation. *Riverside v. Rivera* (1986), 477

U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466. Although the court's focus was on an individual obtaining counsel to file claims under the Civil Rights Act, the rationale is applicable to all claims. Consulting with an attorney is the first step toward gaining access to the courts.

The only Ohio precedent on point is *Simonelli v. Anderson Concrete Co.* (1994), 99 Ohio App.3d 254, 650 N.E.2d 488. In *Simonelli*, the Franklin County Court of Appeals not only determined that Ohio public policy encourages individuals to consult an attorney regarding a possible claim, but also held that the public policy would be jeopardized if an employee were dismissed for consulting an attorney. *Id.* The court held that "the act of firing an employee for consulting an attorney could serve as the basis for a public–policy exception to the common-law employment-at-will doctrine." *Id.* at 259, 650 N.E.2d at 492. Simonelli alleged that when she consulted an attorney about a disciplinary warning issued by her employer, her employer fired her for getting an attorney involved. *Id.* at 257, 650 N.E.2d at 490. We agree with our colleagues in Franklin County.

In deciding *Simonelli*, the court found persuasive the reasoning of an Iowa federal court in *Thompto v. Coborn's, Inc.* (N.D.Iowa 1994), 871 F.Supp. 1097. *Id.* at 259, 650 N.E.2d at 491–492. The analysis in *Thompto* parallels Professor Perritt's checklist adopted by the Ohio Supreme Court. The *Thompto* court found a violation of the public policy of Iowa based upon a number of factors, including (1) "the fact that lawyers, as guardians of the law, play an important role in the preservation of society"; (2) the adoption by the state of the Code of Professional Responsibility, which states that citizens of the state are entitled to access to professional legal services; and (3) the fact that attorneys are the key to obtaining relief from violations in the employment context. *Id.* We believe that all of those factors have exact parallels in Ohio. And we agree with the *Thompto* court that even if the above factors "in support of the public policy did not exist, * * * a consultation with a lawyer is so fundamental to our system of justice that an employer's discharge of an employee for consulting a lawyer would violate public policy." *Id.* at 259, 650 N.E.2d at 492, quoting *Thompto*, 871 F.Supp. at 1121.

Although Ohio's Constitution and common law provide a basis for the public-policy exception, they do not contemplate any remedy for violations. As in *Simonelli*, filing a wrongful-discharge suit was Chapman's only legal remedy. Adia contends that Chapman had an opportunity to redress her injury in a suit against P & G. However, as a direct result of her letter of inquiry, Chapman was placed on a paid leave of absence and never regained her former position or a comparable position with Adia. In essence, she was forced to choose between the job she had and the right to pursue a claim. Chapman needed to consult with an attorney in order to assess the validity of a potential claim. For Chapman,

contacting and meeting with her attorney was the preliminary step in gaining access to the courts. Precluding Chapman from consulting an attorney about a potential claim slammed the courthouse door shut and barred her opportunity to redress an alleged wrong.

■■ "The employment-at-will doctrine was judicially created, and it may be judicially abolished. Clearly, it is the responsibility of the Ohio judiciary to determine whether sufficiently clear public policy reasons exist to support a common-law exception to the doctrine of employment at will * * *." *Kulch*, 78 Ohio St.3d at 161, 677 N.E.2d at 328. Therefore, we hold that it is repugnant to the public policy of this state for employers to terminate employees for exercising their right to consult a lawyer. The courthouse door must be open to the people of Ohio, and it is not ajar when citizens may be fired for entering.

■ We conclude that the trial court erred in granting summary judgment because terminating an employee for consulting an attorney regarding the merits of a suit that would affect the employer's interest is a violation of public policy in Ohio.

### III.  Constructive Termination

■■ Chapman argues that summary judgment was also inappropriate in this case because she provided sufficient evidence to establish that she was constructively terminated. Adia argues that Chapman's refusal of both of its offers for continued employment is evidence that Chapman was not fired and that she voluntarily quit. Because Chapman chose to reject the transfers, she must show that she was constructively terminated and that her termination was motivated by conduct related to the public policy. *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 588, 664 N.E.2d 1272, 1280; *Collins*, 73 Ohio St.3d 65, 652 N.E.2d 653.

Adia admitted that the company placed Chapman on a paid leave of absence and attempted to transfer her to another branch because P & G believed that keeping Chapman on its account would create a conflict of interest. P & G felt that a conflict of interest would be created because Chapman had consulted a lawyer regarding a possible claim against P & G. Based on these facts, we are convinced that Chapman produced sufficient evidence to establish that if she were constructively terminated, which is a question for the trier of fact, her termination was motivated by conduct related to the public policy.

■ Courts generally apply an objective test when determining whether an employee has been constructively terminated. *Mauzy*, 75 Ohio St.3d at 588, 664 N.E.2d at 1280. "In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person

believe that termination was imminent." *Id.* at 589, 664 N.E.2d at 1281. A case-by-case analysis as well as "an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct on the employee" is required to determine whether a reasonable person would feel compelled to resign because of the conditions at the workplace. *Scandinavian Health Spa, Inc. v. Ohio Civ. Rights Comm.* (1990), 64 Ohio App.3d 480, 487, 581 N.E.2d 1169, 1173. No single factor is determinative. *Mauzy,* 75 Ohio St.3d at 589, 664 N.E.2d at 1281. Instead, myriad factors are considered, including reduction in sales territory, poor performance evaluations, and criticism in front of coemployees. *Id.* An offer by an employer of a transfer does not change the analysis. *Id.* Also, "[a] transfer accompanied by measurable compensation at a comparable level does not necessarily preclude a finding of constructive discharge." *Id.*

▪ Adia offered Chapman a transfer accompanied by an allegedly comparable level of compensation. However, discrepancies exist about whether Chapman's compensation would have diminished if she had accepted either of Adia's alternative offers to transfer. Chapman testified that the temporary service business is based on relationships, not competency. Chapman stated that even though Adia had promised to pay her commission based on the performance of the Tri–County office until December 1995, her income may not have been the same if the office was under the direction of a different branch manager.

In addition, Chapman contended that even if her income did remain the same until December, it would decrease thereafter if she accepted a position either at the nonexistent Clermont County branch or at the Florence branch. Chapman asserted that her compensation would decrease if she started a new Clermont County branch because a client base did not exist in the Clermont area to support a new branch. Conversely, Steele contended that, based upon demographics, the Clermont County branch was the key market for the Cincinnati area. We take note of the 1992 documentation by Rimsky, which states that the relocation of Chapman to a new Clermont County branch would not be practical, and of the fact that Adia never opened a branch in the Clermont area.

Chapman asserted that her compensation would decrease if she worked at the Florence branch because the Florence branch was barely "squeaking by" each month. Although Chapman did not receive any financial reports or business plans from Adia to prove this statement, she attended monthly sales meetings of the area branch managers, including the Florence branch manager, at which numbers were shared by each office. On the other hand, Steele asserted that the Florence branch was one of the top twenty-five offices in the country. It is unclear whether Chapman's compensation level would have decreased if she had accepted either position.

Chapman testified that her working conditions would be intolerable at either branch. Chapman's main complaint about accepting the position at the Clermont County branch was that she would be forced to work outside Rimsky's office until the Clermont office was operable. Chapman considered this intolerable because she allegedly had been physically and verbally abused by Rimsky. However, the facts are in dispute about what actually occurred during their encounter in July 1995. In addition, Chapman found the distance from her home to the Florence branch too great and considered it intolerable.

Finally, although the record does not establish clearly what effect, if any, the altercation of July 1, 1995, between Rimsky and Chapman had on the decision to transfer Chapman from the Tri–County branch, Rimsky drafted an interesting file memorandum on July 9, 1995, that stated: "If we look at her collective violations of company rules and her indiscretions, we may be in a position to bring this to a quick conclusion, either by immediately reassigning her or taking other action." Rimsky alleged that Chapman had removed confidential documents from the Tri–County branch in violation of company rules. Chapman stated that this allegation was untrue. Conversely, Wilson contended that the altercation and allegations had no effect on his decision to transfer her and that they were considered independent events. He also repeatedly stated that he wanted to keep Chapman employed with Adia.

Considering all of these factors together, we hold that Chapman produced sufficient evidence to raise genuine issues of material fact about whether a reasonable person would have found the working conditions so intolerable under the circumstances that the person would have felt compelled to resign. Therefore, the issue regarding constructive termination needs to be resolved by a trier of fact. The trial court erred in granting summary judgment on the issue of wrongful discharge because the record does not conclusively resolve these issues.

## IV. Conclusion

As discussed above, we hold that (1) when an employer terminates an employee for consulting an attorney regarding an issue that affects the employer's business interests, the employer has violated clear public policy in Ohio; and (2) Chapman has produced sufficient evidence regarding constructive termination to survive a motion for summary judgment.

We reverse the summary judgment granted by the trial court and remand the case for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

DOAN, J., concurs.

HILDEBRANDT, J., concurs separately.

HILDEBRANDT, Judge, concurring separately.

I concur in the reversal of the trial court's entry of summary judgment in favor of appellee because I believe that there exists in Ohio a public policy in favor of encouraging individuals to consult attorneys to determine their legal rights, and that appellant submitted sufficient evidentiary material to show that genuine issues of material fact exist as to each fact-dependent element of appellant's claim for discharge in violation of public policy. I respectfully concur separately in this matter because I believe that the majority goes beyond the analysis necessary for disposition of this claim and uses language that could be (mis)construed to broaden the exception beyond that anticipated by the Supreme Court of Ohio.

The Ohio Supreme Court, in *Greeley v. Miami Valley Maintenance Contr., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, and *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 652 N.E.2d 653, has clearly stated that an employer may not terminate an employee for a reason that contravenes a public policy of this state. In this case, the issue raised by appellant is whether Ohio has a public policy in favor of individuals being able to consult with an attorney to determine their legal rights. The majority goes beyond the assignment of error and posits the issue as whether Ohio law permits an employer to terminate an employee for consulting an attorney. This expression of the issue is far broader than necessary in resolving this appeal.

I agree with the majority that there exists in Ohio a public policy in favor of consulting an attorney to determine one's legal rights. Because the lower court based its decision on summary judgment on this issue alone, our resolution of that issue is sufficient to resolve the appeal and to remand for further proceedings. The majority goes beyond this resolution, however, by making the blanket statement in the first sentence of the opinion and in its holding that Ohio law *does not* allow a person to be fired for consulting an attorney. I believe that such a pronouncement exceeds this court's proper scope of review of the case, even though the majority otherwise acknowledges that other factors, such as whether the employer had an overriding legitimate business justification for its action, might defeat appellant's public-policy tort claim.

I additionally believe that the majority's suggestion that the doors to the courthouse were "slammed * * * shut" to this employee by the appellee's conduct and that this court's opinion somehow keeps those doors open both distracts from and exceeds the conclusions necessary for disposition of this appeal. We are limited to determining, first, whether consultation of an attorney

is a matter of public policy in Ohio that would be undermined by the discharge of an employee under the circumstances of this case and, second, whether genuine issues of material fact exist as to the remaining elements of appellant's claim. The majority's analysis unnecessarily intermingles the concededly important issues of access to the courts with consultation of an attorney as the primary public-policy issue. We were asked to pass upon issues of employment law and limitations on the discharge of an otherwise at-will employee for consulting an attorney, and I would confine our commentary to that arena.

As stated above, I believe that genuine issues of material fact do exist regarding appellant's public-policy claim, and I also concur in the majority's analysis of the constructive-discharge claim. I wholeheartedly concur in the reversal and remand of this matter to the trial court.