OPINION.
{¶ 1} The plaintiffs-appellants, Billy and Cheryl Smiddy, appeal from the trial court's order granting summary judgment to their former employer, Kinko's Inc., and defendant-appellees Scott Seay and Adel Karam on claims resulting from their discharge by Kinko's. In their single assignment of error, the Smiddys contend that summary judgment was precluded by the existence of genuine issues of material fact relative to their claims for (1) tortious interference with their employment, (2) civil conspiracy, (3) breach of an implied contract of employment, and (4) promissory estoppel. Because the Smiddys' appeal is, in reality, nothing more than an expression of disagreement with the at-will nature of their previous employment, we affirm the judgment of the trial court.
{¶ 2} T.J. Kinko's, a partnership, hired Cheryl Smiddy as a manager in 1982. In 1988, T.J. Kinko's hired Billy Smiddy as an entry-level employee. In 1997, Kinko's, Inc., purchased one hundred and twenty-five individual Kinko's partnerships, including T.J. Kinko's. The Smiddys applied for employment with Kinko's, and, on March 1, 1997, Kinko's hired Billy Smiddy as the Cincinnati regional manager and Cheryl Smiddy as the Cincinnati regional training manager. The Smiddys' written employment agreements and the company's Co-Worker Handbook explicitly stated that the Smiddys were employees-at-will. The Smiddys' employment agreements further provided that they could be subject to "immediate termination" for failure to comply with the policies in both the company's Policies and Procedures Manual and its Co-Worker Handbook.
{¶ 3} In September 1999, Kinko's audit department in Ventura, California, conducted a two-year internal audit of upper-management and employee expense reports from 1997 through 1998. The audit determined that the Smiddys and other employees had been overpaid because they had submitted duplicate expense reports for travel, lodging, and meals, all in violation of the policies and procedures set forth in the company manual. Specifically, the audit disclosed that Billy and Cheryl Smiddy received overpayments in the sum of $4,747.11 and $3,514.11, respectively. Charles Fischer, Kinko's vice-president of human resources, and Bernie Perine, Billy Smiddy's immediate supervisor, confronted Billy Smiddy at a meeting in Philadelphia with a copy of the audit. According to Fischer, Smiddy's response was, "This could mean my job." In his defense, Smiddy maintained that the irregularities were unintentional, and that the office administrator had prepared the duplicative forms. Smiddy acknowledged, however, that he did not verify or personally sign his expense reports as was required by the policies and procedures set forth in the company manual.
{¶ 4} James Thornton, director of Kinko's internal audit department, reported the results of the audit to Scott Seay, Kinko's newly appointed Chief of Field Operations, who was responsible for the company's regional operations, including the Smiddys' region. On October 1, 1999, the Smiddys submitted a joint response in writing to Fischer in which they acknowledged that most of the items listed in the audit correctly reflected overpayments. The Smiddys maintained, however, that they did not intend the overpayments. They enclosed two cashier's checks in the total amount of the their respective overpayments and stated, "We will never allow this to happen again." They further offered their apologies for "the failure to follow the identified processes, and systems that surround this matter."
{¶ 5} Paragraph 5 of the standards of conduct in Kinko's Coaching, Counseling and Documentation Handbook, which was to be used by the company's management, provided that submitting false expense reports was "unacceptable and grounds for immediate dismissal." Fischer consulted with Paul Rostron, senior vice-president of human resources, who advised him that, in his opinion, the Smiddys' expense reports represented a terminable violation due to the number of occurrences and the total amount overpaid. Subsequently, Seay met with Thornton, Fischer, Rostron, and Neil Stewart, the vice-president of field operations, to discuss the Smiddys' future with Kinko's. After receiving approval from Joe Hardin, Kinko's CEO, Seay notified the Smiddys that they were being terminated for violations of paragraph 5 of the handbook, which, in the company's view, constituted "[g]ross negligence in the performance of assigned duties or in the care or use of company property/services."
{¶ 6} The Smiddys asked Seay that, in lieu of termination, they be allowed to go through the "positive discipline process" provided by the company's Coaching, Counseling, and Documentation Handbook. The "positive discipline process" was also referred to in the Co-Worker Handbook. Seay declined. Kinko's returned the checks that the Smiddys had tendered for the overpayments.
{¶ 7} Because summary judgment presents only questions of law, the appellate court must review the record de novo. See Polen v. Baker,92 Ohio St.3d 563, 564-565, 2001-Ohio-1286, 752 N.E.2d 258. Under Civ.R. 56(C), summary judgment is proper when no genuine issue of material fact remains to be litigated, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to identify those portions of the record that demonstrate the absence of a genuine issue of material fact. Dresher v. Burt, 75 Ohio St.3d 280, 293, 1996-Ohio-107,662 N.E.2d 264; see also Civ.R. 56(C).
{¶ 8} The Smiddys argue that a genuine issue of fact existed as to whether Seay and Karam tortiously interfered with their employment relationship at Kinko's. We disagree. In Ohio, either party to an employment-at-will may terminate the relationship for any reason or for no reason at all, provided that the termination is not otherwise unlawful. Greeley v. Miami Valley Maintenance Contrs., Inc. (1990),49 Ohio St.3d 228, 234, 551 N.E.2d 981; Chapman v. Adia Services, Inc.
(1997), 116 Ohio App.3d 534, 541, 688 N.E.2d 604. The employer's motives may even be malicious. Anderson v. Minter (1972), 32 Ohio St.2d 207,291 N.E.2d 45; see, also, Contadino v. Tilow (1990), 68 Ohio App.3d 463,589 N.E.2d 48. Exceptions exist only where the employer discharges the employee in violation of a public policy clearly expressed in either the state or federal constitutions, state statutes, administrative rules and regulations, or the common law. Only in these instances does an at-will employee have an actionable tort against the employer for wrongful discharge. See, e.g., Collins v. Rizkana, 73 Ohio St.3d 65, 69-70,1995-Ohio-135, 652 N.E.2d 653 (wrongful discharge violates public policy based on sexual harassment); Painter v. Graley, 70 Ohio St.3d 377,1994-Ohio-334, 369 N.E.2d 51, paragraph three of the syllabus, overrulingTulloh v. Goodyear Atomic Corp. (1992), 62 Ohio St.3d 541, 584 N.E.2d 729.
{¶ 9} Furthermore, an employee does not have a claim for damages for tortious interference with the employment relationship against one inside the company whose position entitles them to interfere. A person in a supervisory capacity or other position of authority over the employee cannot be sued for interfering with the employment relationship that it is his duty to monitor, supervise, or enforce. Tilow, supra, at 467-468,589 N.E.2d 48, relying on Anderson, supra. To circumvent this rule, the Smiddys argue that Seay acted outside the scope of his employment when he bypassed the corporate hierarchy by taking the decision to discharge the Smiddys from Perrine, their immediate supervisor. Although Seay testified in his deposition that he wanted the couple's firing to send a message that "gross negligence was not going to be tolerated" at the company, the Smiddys argue that Seay, who had been chief of operations for only five months, was actually motivated by personal reasons. To support this argument, the Smiddys point to statements Seay reportedly made to others that he wanted to "send a message" about himself and "set the tone" for how his leadership would be perceived.
{¶ 10} The Smiddys rely on our observation in Tilow, supra, that it is questionable whether the holding in Anderson affords a person who is not "in a position of supervision or authority" the same protection against tortious liability for intentional interference. Cf. Moses v.Budd Co. (Dec. 3, 1993), 6th Dist. No. 92WD041. This statement, however, was meant to question the applicability of Anderson to an outsider to the relationship, such as an intermeddling co-worker, not one such as Seay who, by the nature of his position within the company, was certainly entitled to make decisions affecting the Smiddys' at-will employment. As Kinko's chief of field operations, Seay was, according to his employment agreement, to report to Kinko's CEO and perform all duties assigned to him by the CEO, as well as any other duties within his job description. The Smiddys' claim that only their supervisor, Perrine, had authority to terminate them is specious. Fischer testified without contradiction that Seay's position in the company ultimately made him responsible for the decision whether to terminate the Smiddys. Furthermore, Seay obtained the approval of Kinko's CEO to terminate them, thus eliminating any plausible argument that he was acting beyond the scope of his authority. The evidence is also undisputed that Perrine recused himself from discussions concerning the Smiddys' termination because he had signed and approved the expense forms questioned by the audit.
{¶ 11} The Smiddys characterize their termination by Seay as malicious because they had given Kinko's twelve and eighteen years, respectively, of outstanding performance. Billy Smiddy testified that he was usually ranked as the top-performing manager or, at worst, among the top five, and that Perrine had told him that he was on a career path to become a vice-president. While all these things may have been true, they were not legally sufficient to alter the at-will nature of the Smiddys' employment.
{¶ 12} The Smiddys finally argue that their termination by Seay was not in the best interests of the company and was therefore actionable as tortious interference. They cite as the basis for this argument the Sixth Appellate District's decision in Moses v. Budd Co., supra, in which the court misapprehended our holding Tilow as applying only where the termination is in the best interests of the company. Our holding inTilow was never meant to depend upon the wisdom of the termination. To adopt such a rule would require a court to substitute its business judgment for that of a company and second-guess management on internal disciplinary matters. The question for the purpose of tortious interference is not whether the firing served the best interests of the company, but whether the alleged act of interference was within the scope of the person's duties. If it was, and the employment was at-will, there is simply no basis to hold the person liable for interfering with the employment. In Tilow, for example, the executive director of a halfway house was acting within his position of authority to evaluate subordinates when he decided to fire a suicidal suicide counselor. Regardless of whether the termination actually proved to be in the halfway house's best interests, the director was entitled to make that decision, and he therefore could not be held liable for tortiously interfering with the employment. To hold otherwise would completely eviscerate management's right to terminate an at-will employee for any reason or no reason at all.
{¶ 13} With respect to their claim of tortious interference against Karam, Billy Smiddy's replacement, the Smiddys argue that the evidence of his previous relationship and conversations with Seay supported a reasonable inference that he had engaged in an unlawful effort to undermine Billy Smiddy's employment. They argue that Karam used Seay's influence to obtain Billy Smiddy's position in Cincinnati. Again we disagree.
{¶ 14} At one time both Seay and Karam worked for Comp USA. It is undisputed, however, that Kinko's first contacted Karam through A.T. Carney, a recruiting firm retained by Kinko's. Karam was subsequently interviewed by video teleconference in March 1999 before Seay was hired as chief of field operations. Subsequently, Seay offered Karam, then a regional manager with Comp USA, a position with Kinko's in Pittsburgh, which Karam declined. In late June 1999, Karam was again interviewed for regional operations manager in Atlanta. Seay testified that non-competition and non-solicitation agreements that he had signed with CompUSA before leaving the company made him wary of his contacts with Karam. Karam stated that he initiated calls to Seay to inform him of his interviews, but that his contacts about employment came through Kinko's human resources department
{¶ 15} The alleged collusion between Seay and Karam was based primarily on Billy Smiddy's "impression" that Karam wanted a position in Cincinnati. Karam testified that he actually preferred to remain in Atlanta and that, after his hiring in Cincinnati, he chose to return to Atlanta, accepting a lateral transfer in October 2000. He further stated that he had not heard of the Smiddys until he arrived in Cincinnati in 2000. Perrine testified that, without any pressure from Seay, he alone made the decision to hire Karam as the best candidate from a field of three.
{¶ 16} We hold that, as a matter of law, the evidence in the record was not sufficient to create a genuine issue of material fact whether either Seay or Karam tortiously interfered with the Smiddys' employment with Kinko's.
{¶ 17} With respect to their claim for civil conspiracy, the Smiddys assert that Seay and Karam maliciously colluded to create a position at Kinko's for Karam by having them fired. The tort of civil conspiracy is "a malicious combination of two or more persons to injure another in person or property in a way not competent of one alone * * *."Kenty v. Transamerica Premium Ins. Co., 72 Ohio St.3d 415, 419,1995-Ohio-61, 650 N.E.2d 863; see, also, Prosser Keeton on Torts (5 Ed. 1984) 323, Section 46. To prevail on a claim for civil conspiracy, proof of an underlying unlawful act is essential. Williams v. Aetna Fin.Co., 83 Ohio St.3d 464, 468, 1998-Ohio-294, 700 N.E.2d 859. The element of malice is defined as "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse to the injury of another." Id., quoting, Pickle v. Swinehart (1960),170 Ohio St. 441, 443, 166 N.E.2d 227.
{¶ 18} The Smiddys concede that tortious interference was the underlying unlawful act for their civil conspiracy claim. As we held inWolfer Ent., Inc. v. Overbrook Dev. Corp. (1999), 132 Ohio App.3d 353,359, 724 N.E.2d 1255, if the substantive claims on which the civil-conspiracy claim is based have no merit, the civil-conspiracy claim also lacks merit. Because we hold that the Smiddys did not have a valid claim for tortious interference, Kinko's, Seay and Karam were entitled to summary judgment on the Smiddys' claim for civil conspiracy.
{¶ 19} The Smiddys next argue that summary judgment was inappropriate because there were triable issues concerning whether the at-will nature of their employment was altered either on the basis of an implied contract or by the doctrine of promissory estoppel. The crux of their implied-contract argument is that the progressive disciplinary process outlined in Kinko's handbooks, as well as various oral communications regarding that process, constituted a legally binding promise by the company that they could not be fired until after a process of progressive discipline. According to Billy Smiddy, "I was under the impression that I would be employed at Kinko's unless I, you know, had done something to rightfully cause my termination that had to be proven through a positive discipline process and that I would always have that opportunity to go through a discipline process before being terminated or let go, that after a ninety-day probationary period that everyone had the right to go through a positive discipline process before being allowed to be terminated or let go by the company. And that was verbally communicated to me by multiple people."
{¶ 20} It is true that the employment-at-will doctrine may be altered by an implied contract or by promissory estoppel. Mers v.Dispatch Printing Co. (1985), 19 Ohio St.3d 100, 483 N.E.2d 150, paragraph two of the syllabus. Under a theory of implied contract, the terms of employee handbooks, policy manuals, and the like may alter the initial at-will nature of the employment. Uebelacker v. Cincom Systems,Inc. (1988), 48 Ohio App.3d 280, 282-283, 549 N.E.2d 1210. In order to have this effect, however, both parties must have intended for the language in handbooks or manuals to be legally binding. In other words, the employee's belief that the handbook affords him contractual rights does not mean that it does unless the employer intends it to do so. As in all contracts, express or implied, both parties must intend to be bound. "Absent mutual assent * * * a handbook becomes merely a unilateral statement of rules and policies which create no obligation and rights."Tohline v. Central Trust Co., N.A. (1988), 48 Ohio App.3d 280, 282,549 N.E.2d 1223, approved in Wing v. Anchor Media, Ltd. of Texas (1991),59 Ohio St.3d 108, 110, 570 N.E.2d 1095. See, also, Weiper v. Hill Associates (1995), 104 Ohio App.3d 250, 258, 661 N.E.2d 796.
{¶ 21} Furthermore, the Ohio Supreme Court held in Wing that, "[a]bsent fraud in the inducement, a disclaimer in an employee handbook stating that employment is at-will precludes an employment contract other than at-will based upon the terms of the employee handbook." Id., syllabus. In this case, the Coaching, Counseling Documentation Handbook stated, "Termination may be at sole discretion of the company. The enumeration below of certain Standards of Conduct does not alter the at-will nature of the co-worker's employment which is defined in the front portion of this Handbook." And the Co-worker Handbook contained the following disclaimer: "Notwithstanding Kinko's commitment to positivediscipline, employment at Kinko's remains at will, which is defined in the front portion of this Handbook." (Emphasis added.) Likewise, the Kinko's Policies and Procedures Manual stated, "The at-will nature of the employment relationship may only be changed by a written agreement signed by the Chief Executive Officer or Vice President, Human Resources and Development, and will not be affected by verbal comments from any Kinko'sco-worker or agent." (Emphasis added.)
{¶ 22} Additionally, the Smiddys signed separate employment-at-will agreements explicitly stating that they could be terminated at any time, with or without cause, and without notice. The disclaimer in Billy Smiddy's written employment agreement stated, "Kinko's will not be bound by any oral statements or promises that are inconsistent with this agreement, and this agreement can only be modified or amended in writing by an authorized representative of Kinko's." The disclaimer in Cheryl Smiddy's employment agreement stated that the terms could be "changed by a written agreement signed by the Chief Executive Officer or Vice President, Human Resources Development."
{¶ 23} Although the Smiddys argue that they were treated differently than other employees identified by the audit for expense-account irregularities, this fact was immaterial since they were employees-at-will. Some employees identified by the audit resigned, some were terminated, and others were not terminated but remained with the company. Even if it is assumed that Kinko's treated the Smiddys differently, such unequal treatment did not affect the legality of their termination absent a showing of prohibited discrimination under R.C.4112.02.
{¶ 24} The basis for the Smiddys' promissory-estoppel claim consisted of written statements and alleged oral statements made by various Kinko's employees that led the Smiddys to believe that they could only be discharged for cause. They also maintained that, after the audit, they were told by people within Kinko's department of human recourses that they would not be terminated, and that Perrine and others had told Billy Smiddy that he would not be terminated because he was one of Kinko's top managers.
{¶ 25} To establish a prima facie claim for promissory estoppel, an employee must demonstrate detrimental reliance on specific promises of job security. Wing, supra, at 110, 570 N.E.2d 1095. Obviously, the statements must be made before they are relied upon. The Smiddys' attempt to show their reliance on statements that were made only after they submitted duplicate expense reports in violation of company policy is illogical. (Such statements would be relevant only if the Smiddys were intending to show that they stayed with the company after the audit, passing up other job offers, in reliance upon the promise that they would not be fired.) Further, the Smiddys could not have justifiably relied upon such oral statements, regardless of when they were made, since they were made neither in writing nor by someone with the authority to modify the at-will nature of their employment pursuant to their employment agreements and the company handbooks. See Weiper, supra, at 260-261,661 N.E.2d 796. The Smiddys were expected to have read and understood the terms of their employment agreements, as well as the disclaimers in the handbooks. It was unreasonable for them to have relied on oral statements, as they should have known, having read the various disclaimers, that the individuals who made them lacked the authority to alter the terms of their at-will employment. See Rolsen v. Lazarus
(Sept. 29, 2000), 1st Dist. Nos. C-990588 and C-990627.
{¶ 26} Based upon the foregoing analysis, we overrule the Smiddys' single assignment of error. Even when the evidence is viewed in the light most favorable to the Smiddys, we hold that reasonable minds could have come to but one conclusion: that the Smiddys were lawfully terminated pursuant to the at-will nature of their employment, and that Kinko's, Seay and Karam were entitled to judgment as a matter of law on all the claims against them.
Judgment affirmed.
Painter, P.J., and Sundermann, J., concur.