**Christopher TERRELL Plaintiff**

v.

**UNISCRIBE PROFESSIONAL SERVICES, INC.**
**Defendant**

**No. 1:04CV1288.**

United States District Court,
N.D. Ohio,
Eastern Division.

Nov. 10, 2004.

Michael R. Hamed, Schwartz, Kushner & Rendon, Cleveland, OH, for Plaintiff.

Ines M. Monte, Brennan & Monte, Chicago, IL, John Gerak, Vorys, Sater, Seymour & Pease, Cleveland, OH, for Defendant.

## MEMORANDUM OF OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

WELLS, District Judge.

Before the Court is defendant Uniscribe Professional Services, Inc.'s ("Uniscribe") motion to dismiss Counts I and V of plaintiff's amended complaint, pursuant to Fed. R.Civ.P. 12(b)(6), for the failure to state a claim upon which relief can be granted. (Docket # 6). Plaintiff Christopher Terrell has filed a brief in opposition. (Docket # 8). No reply has been filed.

For the reasons set forth below, defendant Uniscribe's motion to dismiss is denied.

## I. THE COMPLAINT[1]

Plaintiff Christopher Terrell's five-count complaint arises out of his prior employ-

---

1. In ruling on Uniscribe's motion to dismiss, this Court accepts as true all of plaintiff Christopher Terrell's factual allegations. *Lillard v.* *Shelby County Bd. of Educ.,* 76 F.3d 716, 724 (6th Cir.1996).

ment with defendant Uniscribe and the allegedly wrongful termination of that employment. Uniscribe is a corporation which, among other things, "provides copy and imaging assistance to law firms and other businesses engaged in document-intensive projects." (Am. Compl. at ¶ 3).[2] In August 1999, Mr. Terrell was recruited and ultimately hired by Uniscribe as a Production Manager. Uniscribe promoted Mr. Terrell in October 2002 to General Manager of Uniscribe's Cleveland office, making him the "highest-ranking employee" at that office and placing him in "charge of both operations and sales." (Am. Compl. at ¶¶ 4–5).

In 2004, as in every prior year, Uniscribe presented Mr. Terrell an "incentive plan" ("2004 Bonus Plan") for him to sign. (Am. Compl. at ¶ 6, Ex. A). Related to Mr. Terrell's compensation, the 2004 Bonus Plan provides specific performance-related criteria upon which his bonus is based and explains the manner by which this bonus is payed out. (Am. Compl. at ¶ 6, Ex. A). It also includes a "Bonus Accelerator" which provides that the "General Manager has the opportunity to improve their bonus by exceeding their Revenue and/or Operating Income targets." (Am. Compl. at ¶ 8, Ex. A). According to Mr. Terrell, Uniscribe's Cleveland office performed "exceptionally well" under his direction in 2004 and therefore, pursuant to the 2004 Bonus Plan, he was allegedly entitled to a first-quarter bonus of $45,000. (Am. Compl. at ¶¶ 7 and 9). Uniscribe did not, however, pay him a bonus of $45,000. (Am. Compl. at ¶¶ 9 and 10). Instead, Mr. Terrell's superior told him that the quarterly bonus was implicitly capped and asked Mr. Terrell to accept $10,248 as full payment of his first-quarter bonus. (Am. Compl. at ¶ 10). Mr. Terrell refused to cash the check. (Am. Compl. at ¶ 10).

Subsequently, Mr. Terrell retained counsel, who sent a letter to Uniscribe's CEO and plaintiff's superior attempting to resolve the matter. (Am. Compl. at ¶ 11). Plaintiff's superior made a "sarcastic" comment that Mr. Terrell had made a "wise career choice" by retaining counsel. (Am. Compl. at ¶ 11). Counsel for Uniscribe responded in writing that, because the "express language of Uniscribe's 2004 Bonus Plan" states that "bonus pay is 'subject to change without notice,'" it did not create any enforceable contractual obligations. (Am. Compl. at ¶ 11, Ex. B). Mr. Terrell sued Uniscribe on 1 June 2004. (Am. Compl. at ¶ 11). On 22 June 2004, five days after it was served with Mr. Terrell's complaint, Uniscribe discharged him, claiming "falsely, that the termination was based upon its decision to 'downsize.'" (Am. Compl. at ¶¶ 11, 15 and 33). Upon his termination, Uniscribe presented Mr. Terrell with a document to sign, which stated that it owed him no bonus. (Am. Compl. at ¶ 15). Mr. Terrell refused to sign. (Am. Compl. at ¶ 15).

## II. MOTION TO DISMISS STANDARD

In considering a motion to dismiss under Rule 12(b)(6), the Court must construe the complaint liberally in the plaintiff's favor and accept all of plaintiff's factual allegations as true. *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir.1996). The Court's task is necessarily a limited one, as "the issue is not whether a [party] will ultimately prevail but whether the [party] is entitled to offer evidence to support the claims." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir.1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Indeed, a Rule 12(b)(6) motion to dismiss will be granted "only if it is clear that no relief could be

---

**2.** Plaintiff's amended complaint is attached as Exhibit A to Uniscribe's motion to dismiss.

granted under any set of facts that could be proved consistent with the allegations." *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir.1996) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (holding dismissal to be appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief). If, however, the complaint fails to contain "either direct or inferential allegations respecting all the material elements" necessary to sustain recovery under some viable legal theory, it will be dismissed pursuant to Rule 12(b)(6). *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 346 (6th Cir.2000) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)).

## III. LAW AND ANALYSIS

In his first amended complaint, Mr. Terrell asserted five claims against Uniscribe: Breach of Contract (Count I), Fraud (Count II), Unjust Enrichment (Count III), Promissory Estoppel (Count IV), and Wrongful Discharge (Count V). In its present motion, Uniscribe seeks the dismissal of Mr. Terrell's breach of contract and wrongful discharge claims.

### A. Breach of Contract (Count I)

In his first claim, Mr. Terrell contends that Uniscribe "breached the terms of its incentive compensation plan." (Am. Compl. at ¶ 17). Uniscribe argues that this claim must fail as a matter of law because the 2004 Bonus Plan is not an enforceable contract.

An enforceable contract is one of the basic prerequisites of a breach of contract claim. *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995). Accordingly, to succeed in a breach of contract action, a party must prove all the essential elements of a contract including an offer, acceptance, the manifestation of mutual assent, and consideration (the bargained for legal benefit and/or detriment). *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3, 770 N.E.2d 58 (2002). A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract. *Episcopal Retirement Homes. Inc. v. Ohio Dept. of Indus., Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991). In its motion, Uniscribe argues that the mutual assent to create a contract is lacking when a document contains a provision that it is "subject to change without notice." (Docket # 6, at 6).[3] Thus the essential issue is whether, under Ohio law, an enforceable contract may exist when one of its express provisions states that it is subject to change without notice.

While it is the courts' duty to interpret the terms of a contract as a matter of law, the existence of a contract itself is generally a matter left for the trier of fact. *Oglebay Norton Co. v. Armco. Inc.*, 52 Ohio St.3d 232, 235, 556 N.E.2d 515 (1990); *Gruenspan v. Seitz*, 124 Ohio App.3d 197, 211, 705 N.E.2d 1255 (1997); *Finsterwald–Maiden v. AAA South Central Ohio*, 115 Ohio App.3d 442, 447, 685 N.E.2d 786 (1996) (citing *Normandy Place Assoc. v. Beyer*, 2 Ohio St.3d 102, 106, 443 N.E.2d 161 (1982)) (concluding that whether the parties "intended to create a binding con-

---

**3.** Uniscribe also points to a provision of the 2004 Bonus Plan which states that the "compensation plan is not a guarantee of employment." (Docket # 6, at 6; Am. Compl. Ex. A). Because Mr. Terrell does not contend that the 2004 Bonus Plan created a guarantee of employment, this provision is not determinative as it is clear that at-will employees may enter into binding subsidiary contracts with their employers. *Finsterwald–Maiden*, 115 Ohio App.3d at 446, 685 N.E.2d 786.

tract is a question of fact properly resolved by the trier of fact"); *Garrison v. Daytonian Hotel*, 105 Ohio App.3d 322, 325, 663 N.E.2d 1316 (1995); *Ankle & Foot Care Centers v. InfoCure Sys., Inc.*, 164 F.Supp.2d 953, 958 (N.D.Ohio 2001) (explaining that "[w]hether or not a contract exists is a question of fact.") [4]

In arguing that the 2004 Bonus Plan is not an enforceable contract as a matter of law, Uniscribe relies entirely on a string of employment handbook cases in which Ohio courts determined, on summary judgment or on a motion to dismiss, whether a handbook created an enforceable contract. While employee handbooks may give rise to implied or express contractual provisions that alter the terms of an at-will employment relationship, *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 104, 483 N.E.2d 150 (1985), several Ohio courts have refused to allow such handbooks to transform at-will employment into a contractual relationship when the handbook specifically disclaims any intent to create a contractual relationship and was not the product of any negotiations between the employee and employer. *Karnes v. Doctors Hosp.*, 51 Ohio St.3d 139, 141, 555 N.E.2d 280 (1990) (finding it also relevant that the employee conceded that she never viewed the manual as a binding contract); *Finsterwald–Maiden*, 115 Ohio App.3d at

444 and 447, 685 N.E.2d 786; *Kiel v. Circuit Design Technology*, 55 Ohio App.3d 63, 64 and 66, 562 N.E.2d 517 (1988) (does not discuss the absence or presence of negotiations); *Uebelacker v. Cincom Sys., Inc.*, 48 Ohio App.3d 268, 272, 549 N.E.2d 1210 (1988) (does not discuss the absence or presence of negotiations); *Tohline v. Central Trust Co., N.A.*, 48 Ohio App.3d 280, 283, 549 N.E.2d 1223 (1988) (does not discuss the absence or presence of negotiations). However, these cases are inapposite as they involve explicit disclaimers that the handbook was not intended to create an employment contract, thereby clearly manifesting the absence of mutual assent to create a contract. *Id.*[5]

■ As this case does not involve such an explicit disclaimer, the presence or absence of mutual assent and the determination of whether the 2004 Bonus Plan is an enforceable contract presents questions of fact which cannot simply be resolved as a matter of law on Uniscribe's motion to dismiss. In a similar case involving a bonus plan that expressly stated that "it may be changed, supplemented, or deleted in its entirety from time to time, without prior notice," the Ohio Court of Appeals nonetheless treated the plan as an enforceable contract. *Holderman v. Huntington Leasing Co.*, 19 Ohio App.3d 132, 134, 483 N.E.2d 175 (1984). Given that the exis-

---

4. There are some Ohio courts which have articulated a completely contrary rule: that the existence of a contract is a question of law to be resolved by the court. *See Applegate v. Northwest Title Co.*, 2004 WL 585592, *3 (Ohio App. Mar. 25, 2004); *Reali, Giampetro & Scott v. Soc. Natl. Bank*, 133 Ohio App.3d 844, 850, 729 N.E.2d 1259 (1999); *State ex rel. Horvath v. State Teachers Retirement Bd.*, 1997 WL 217579, at *4 (Ohio App. Apr. 29, 1997); *Doe v. Adkins*, 110 Ohio App.3d 427, 436, 674 N.E.2d 731 (1996). However, these cases appear to stem from a misinterpretation of the Ohio Supreme Court's decision in *Latina v. Woodpath Dev. Co.*, 57 Ohio St.3d 212, 214, 567 N.E.2d 262 (1991), which merely

concluded that the construction of contracts is a question of law.

5. While the handbooks in *Finsterwald–Maiden*, *Kiel*, and *Tohline* also provided that the terms or practices were subject to change, none of the Courts emphasized that fact in their analysis. The only case cited by Uniscribe which specifically addressed a "subject to change" provision is an unreported one, *Cassidy v. U.S.*, 1994 WL 88942, at *7–8 (1994), which relied, at least in part, on the absence of negotiations with respect to the handbook in finding there was no contract and which disposed of the case at the summary judgment stage.

tence of an enforceable contract is a contentious, fact-laden question which, under a certain set of circumstances, could be resolved in Mr. Terrell's favor, Uniscribe is not entitled to the dismissal of his breach of contract claim.

## B.  Wrongful discharge (Count V)

In his fifth claim for relief, Mr. Terrell contends that he was wrongfully discharged in violation of Ohio's clear public policies against "discharging an employee for consulting with an attorney" and against "discharging his employee for suing his employer." (Am. Compl. at ¶¶ 32–33). While Mr. Terrell asserts two independent bases for his wrongful discharge claim, Uniscribe only challenges his wrongful discharge claim to the extent that it relies on his alleged discharge for suing his employer.[6]

■ The Ohio Supreme Court has recognized an exception to the at-will employment doctrine for wrongful discharges in contravention of clear public policy. *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981, syllabus ¶ 3 (1990). To prevail on a claim for wrongful discharge, a plaintiff must prove the following elements:

1.  That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

2.  That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopard-

ize the public policy (the jeopardy element).

3.  The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

4.  The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Kulch v. Structural Fibers. Inc.*, 78 Ohio St.3d 134, 150–51, 677 N.E.2d 308 (1997). Courts determine the clarity and jeopardy elements as a matter of law while the causation and overriding justification factors are factual questions reserved for the trier of fact. *Id.* at 151, 677 N.E.2d 308. Defendant contends that Mr. Terrell cannot establish the clarity element with respect to his discharge as a purported consequence of suing his employer because "[u]nder controlling case precedent in Ohio, there is no public policy in favor of permitting an employee to file suit against his employer." (Docket # 6, at 3).

In making such a proclamation, Uniscribe overstates the clarity of Ohio law on this issue, as Ohio courts have reached differing conclusions. In *Chapman v. Adia Services*, the First District Court of Appeals held "it is repugnant to the public policy of [Ohio] for employers to terminate employees for exercising their right to consult a lawyer." 116 Ohio App.3d 534, 544, 688 N.E.2d 604 (1997). In identifying this clear public policy, the court relied on Article I, Section 16 of the Ohio Constitution (the "Open Courts provision"),[7] various

---

6.  In regard to the other basis for Mr. Terrell's wrongful discharge claim, Ohio courts have resoundingly recognized a clear public policy against discharging an employee for consulting with an attorney. *Hollingsworth v. Time Warner Cable*, 157 Ohio App.3d 539, 556–57, 812 N.E.2d 976 (2004); *Taylor v. Volunteers of America*, 153 Ohio App.3d 698, 701–702, 795 N.E.2d 716 (2003); *Chapman v. Adia Services, Inc.*, 116 Ohio App.3d 534, 543, 688

N.E.2d 604 (1997); *Simonelli v. Anderson Concrete Co.*, 99 Ohio App.3d 254, 259, 650 N.E.2d 488 (1994).

7.  Article I. Section 16 provides in pertinent part that "[a]ll courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law...."

provisions of the Ohio Code of Professional Responsibility as adopted by the Ohio Supreme Court, and common law supporting the proposition that consulting an attorney is "the first step toward gaining access to the courts." *Id.* at 542–43, 688 N.E.2d 604. The court emphasized that an employee should not be "forced to choose between the job she had and the right to pursue a claim" and that the "courthouse door must be open to the people of Ohio, and it is not ajar when citizens may be fired for entering." *Id.* at 543–44, 688 N.E.2d 604.

After *Chapman* was decided, two Ohio Courts of Appeals considered its application in the context of an employee's termination for suing his employer. In *Jenkins v. Parkview Counseling Center, Inc.*, the Seventh District held that a retaliatory termination of an employee for suing his or her employer contravened the same clear public policy identified in *Chapman.* 2001 WL 15938, \*\*7–8 (Ohio App. Jan. 3, 2001) (explaining that the public policy identified in *Chapman* was "clearly intended to include the right to sue an employer"). The Fifth District, in *Taylor v. Volunteers of America*, took a different approach, starting with a reformulation of the public policy as conceived by *Chapman* and *Jenkins* as one *against* terminating employees for pursuing their legal rights into one articulated as being *in favor of* permitting an employee to file suits against his or her employer. 153 Ohio App.3d 698, 702, 795 N.E.2d 716 (2003). Perceiving of the public policy as one encouraging "preemptive" litigation by inadequate employees rather than protecting employees' access to courts, the Fifth District distinguished *Chapman* by noting that "an employee's need for access to legal representation does not necessarily entail the right to file suit against his employer" and disposed of plaintiff's public policy claim as one which would unnecessarily "disrupt the balance of the employer-employee relationship"

and "place the employer in the unenviable position of having to continue in a relationship that has been tainted by the acrimonious nature of litigation." *Id.* at 702–703, 795 N.E.2d 716.

■ Finding the reasoning expressed by *Chapman* and *Jenkins* to be more persuasive, this Court concludes that Ohio has a clear public policy against employers discharging an employee because he or she has sued them. Such a public policy is a logical extension of *Chapman* and is necessary in order to give any substantive meaning to the protection previously afforded employees in *Chapman.* The *Taylor* court's conclusion that an individual cannot be fired for consulting an attorney about his or her rights but can be fired for exercising them does not truly effectuate the public policy concerns at issue. As explained by the court in *Moskowitz v. Progressive Ins. Co.*:

> Limiting the protection of employees, as the *Taylor* court indicates, to protecting the ability of employees to determine their rights and remedies in order to enable them to determine whether to seek access to the courts and risk losing their employment does not adequately protect the public policy favoring access to the courts.

128 Ohio Misc.2d 10, 20, 811 N.E.2d 174 (Ohio Com.Pl.2004). The remedy guaranteed by the Ohio Constitution's Open Courts provision would be "illusory if citizens could lose their jobs for seeking it." *Chapman*, 116 Ohio App.3d at 542, 688 N.E.2d 604. Moreover, the concerns raised by the Court in *Taylor*, many of which also arise in the context of an employee consultation with an attorney, can best be addressed through an analysis and application of the causation and overriding justification elements in the context of each case. *Id.* at 19, 811 N.E.2d 174.

Because Ohio law has a clear public policy against both discharging an employee for consulting an attorney and discharging an employee for suing his employer, Mr. Terrell has stated a claim upon which relief can be granted.

### IV. CONCLUSION

For the reasons set forth above, defendant Uniscribe's motion to dismiss is denied.

IT IS SO ORDERED.