[Cite as *Lucarell v. Nationwide*, 2015-Ohio-5286.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

CHRISTINE LUCARELL,        )
)
    PLAINTIFF-APPELLEE     )
    CROSS-APPELLANT,      )        CASE NO. 13 MA 74
)
V.                   )
)
NATIONWIDE MUTUAL INSURANCE  )
COMPANY,            )
)
    DEFENDANT-APPELLANT   )
    CROSS-APPELLEE.       )


CHRISTINE LUCARELL,        )        CASE NO. 13 MA 133
)
    PLAINTIFF-APPELLEE,    )
)
V.                   )
)        OPINION
NATIONWIDE MUTUAL INSURANCE  )
CO., et al.,           )
)
    DEFENDANTS-APPELLANT.  )

CHARACTER OF PROCEEDINGS:     Civil Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 2010CV1417

JUDGMENT:                 Affirmed in part
Reversed in part
Remanded

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Carol Ann Robb

Dated: December 17, 2015

APPEARANCES:

For Plaintiff-Appellee
Cross Appellant

Attorney Caryn Groedel
Attorney Melisa Mazanec-Fisco
Attorney Chastity Christy
31340 Solon Road, Suite 27
Cleveland, Ohio 44139

For Defendant-Appellant
Cross Appellee

Attorney Thomas Warren
Attorney Stephen Sutton
Attorney G. Karl Fanter
PNC Center
1900 East Ninth Street, Suite 3200
Cleveland, Ohio 44114-3485

Attorney Quintin Lindsmith
Attorney Sommer Sheely
Attorney Victoria Flinn
100 South Third Street
Columbus, Ohio 43215-4291

DONOFRIO, P.J.

{¶1} Defendant-appellant/cross-appellee, Nationwide Mutual Insurance Company, appeals from a Mahoning County Common Pleas Court judgment in favor of plaintiff-appellee/cross-appellant, Christine Lucarell, on Lucarell's claims for constructive discharge, retaliation, invasion of privacy, and breach of contract, following a jury trial resulting in a compensatory-damage award of $3,667,010 and a punitive-damage award of $10.5 million. Nationwide also appeals from the trial court's judgment overruling its Civ.R. 60(B) motion for reconsideration of the court's prejudgment interest ruling.

## Statement of the Facts and Case

{¶2} In 2005, Nationwide contracted with Lucarell to enter into its Agency Executive Program (AE Program). Under the terms of the AE Program Lucarell was an exclusive insurance sales agent for Nationwide. She opened a "scratch" agency, a brand new agency, pursuant to the program. Under the AE Program, Lucarell sold property and casualty insurance and agreed to meet certain sales goals in order to graduate from the 36-month program.

{¶3} As a condition of entering into the AE Program, Lucarell signed an AE Program Performance Agreement (the Performance Agreement) with Nationwide on November 4, 2005. The Performance Agreement provided that Nationwide could terminate Lucarell from the AE Program if she did not meet certain monthly sales goals and certain total sales by the end of the 36-month period. Lucarell asserts that her copy of the Performance Agreement did not contain Exhibit A, which set out her monthly sales requirements. The Performance Agreement also set out Lucarell's commission and bonus compensation plans, her training requirements, her loan disbursement schedule, Nationwide's exclusive ownership right in the policies, and business plans and pro formas prepared by Nationwide for Lucarell's agency.

{¶4} At the same time, Lucarell also entered into an Independent Contractor Agent's Agreement (the Agent's Agreement). The Agent's Agreement required Lucarell to work exclusively for Nationwide selling only Nationwide products. It also provided that Nationwide had the exclusive right to control all of the policies sold by

Lucarell and the right to service her customers. And it provided that Nationwide controlled the pricing of insurance products and what products were available.

{¶5} According to Lucarell, Nationwide enticed her to enter the AE Program by promising her yearly commissions in excess of $200,000. Lucarell claimed that Nationwide showed her an inaccurate business plan and pro forma on which she relied in deciding to enter the AE Program. Lucarell alleged that Nationwide failed to provide her with the necessary training and support that were needed to maintain a successful Nationwide agency.

{¶6} In starting up her business under the AE Program, Lucarell rented and furnished office space. Nationwide required her to take out a loan from Nationwide Federal Credit Union (NFCU) in the amount of $290,000 to start up her business. Lucarell claimed Nationwide insisted that she enter into a lease agreement to rent office space in the Boardman Plaza, which space her sales manager selected, and required her to spend over $40,000 to furnish and equip that office space. She also claimed Nationwide required her to spend $5,000 on a grand opening party for the agency. And Lucarell stated Nationwide required her to hire two employees before she even started earning any income.

{¶7} According to Lucarell, the business plan for her agency was to be mutually agreed upon by her and Nationwide. But Nationwide unilaterally prepared the business plan without her input. Additionally, Lucarell asserted that after she had been in the AE Program for approximately one year, she asked to review her business plan and found that it had been altered.

{¶8} Lucarell opened her agency in January 2006. Nationwide began measuring her performance on February 1, 2006. During her first year of operation, Lucarell produced approximately $400,000 in direct written premium (DWP). These earnings earned her several Nationwide sales awards.

{¶9} According to Lucarell, on February 7, 2007, Nationwide's sales manager came to her home and informed her that if she did not sign the Memorandum of Understanding (MOU) that he brought with him, Lucarell would not

receive the money Nationwide had promised her, her participation in the AE Program would terminate, and the balance due on her NFCU loan would be due immediately. Nationwide asserted the MOU made it easier for agents to meet their production goals.

**{¶10}** Lucarell signed the MOU. She claimed that at the time she signed it, she had just undergone major surgery and was heavily medicated. She also claimed her economic situation offered her no alternative but to sign the MOU. Under the terms of the MOU, Nationwide gave Lucarell $50,000, some of which was earmarked to hire an accountant to prepare a revised business plan for her agency. She did this. Nationwide, however, hired its own accountant, who modified the plan, and then charged Lucarell for this service. Lucarell claimed that the modified business plan was unrealistic and inadequate to sustain her agency. Additionally, the MOU provided that Lucarell released Nationwide from any claims she had against Nationwide up to that point in time.

**{¶11}** Lucarell continued with the AE Program.

**{¶12}** In September 2008, Lucarell entered into a Modified AE Agreement (the Modified AE Agreement) with Nationwide. In signing the Modified AE Agreement, Lucarell acknowledged that Nationwide had given her a chance to exit the AE Program with Nationwide paying off her loan. Lucarell claimed that she signed the Modified AE Agreement only after Nationwide promised to allow her to merge her agency with two other agencies that were terminating and permit her to use the revenue generated by those two agencies toward her production goals. Lucarell further claimed that Nationwide's state sales officer told her that if she did not sign the Modified AE Agreement, Nationwide would not give her the quarterly disbursements to run her agency. Lucarell then asserted that she never received the promised mergers but her DWP requirements were based on the income she was to receive from the mergers.

**{¶13}** Lucarell claimed that Nationwide used the Modified AE Agreement to ensure that she and other AE agents did not successfully complete the AE Program.

She points out the Modified AE Agreement changed the method of calculating the minimum production plan from a cumulative basis to a rolling basis, increased the New Business percentage requirements by 96 percent, and required the AE agents to make monthly loan payments during the production period rather than at the end of the production period as previously set forth. The Modified AE Agreement also contained a waiver of all claims against Nationwide.

{¶14} Lucarell also asserted that starting in September 2008, Nationwide began misreporting to her that she was not meeting her production requirements. She claims that she was actually surpassing those requirements.

{¶15} On April 1, 2009, Lucarell was to receive her quarterly disbursement of $24,457 from Nationwide. Nationwide informed her it would not pay her disbursement because she missed a monthly minimum production plan requirement by four percent. Lucarell filed for an exception under the Modified AE Agreement because she had achieved at least 95 percent of her minimum production plan requirement. In her request for an exception, Lucarell noted that $11,766 of insurance was not included in her total when it should have been and she had $11,600 in insurance pending, which was not included in her totals. Nationwide denied Lucarell's requested exception.

{¶16} On April 9, 2009, Nationwide placed Lucarell on a three-month probationary period for not meeting minimum production goals.

{¶17} On May 29, 2009, Nationwide informed Lucarell that for the next 120 months, instead of being paid the commissions she earned, Nationwide would be applying those commissions to the $274,285.22 due on her NFCU loan. This cut off Lucarell's revenue stream.

{¶18} On July 7, 2009, Lucarell resigned from the AE Program.

{¶19} On April 12, 2010, Lucarell filed a complaint against Nationwide raising claims for breach of the AE Program Performance Agreement, breach of the MOU, fraudulent misrepresentation, breach of the Agent's Agreement, and invasion of privacy for misappropriation of her name.

**{¶20}** Nationwide filed a counterclaim. It asserted that NFCU assigned its right to collect on Lucarell's loan to it and that Lucarell had defaulted on the loan. Therefore, Nationwide raised a claim for breach of the note and asserted it was entitled to judgment on the note in the amount of $291,296.53. It also raised a claim for equitable indemnification.

**{¶21}** Lucarell then amended her complaint to add claims for retaliation, constructive discharge, and breach of the Modified AE Agreement. She also later amended her complaint to include factual allegations that Nationwide's intent in recruiting approximately 400 AE agents was to fail the AE agents and terminate their agencies once the agents had generated a profitable book of business for Nationwide.

**{¶22}** The matter proceeded to a jury trial. The trial court granted Nationwide's motion for a directed verdict on Lucarell's fraudulent misrepresentation claim. All other claims were submitted to the jury. The jury found in Lucarell's favor on all claims and counterclaims. The jury awarded Lucarell damages as follows:

**{¶23}** Breach of Contract:

Breach of independent contractor agent's agreement: $600,000

Breach of AE Program Performance Agreement: $600,000

Breach of MOU: $1,000,000

Breach of First Modification of AE Program Performance Agreement: $2,000,000

Total for Breach of Contract: $4,200,000

Misappropriation of Name:

Nominal damages: $10

Emotional damages: $100,000

Total for Misappropriation: $100,010

Damages for Retaliation:

Costs to defend against counterclaim: $100,000

Emotional damages: $400,000

Total for Retaliation:  $500,000

Damages for Constructive Discharge:

Lost Profits:  $1,500,000

Emotional damages:  $500,000

Total for Constructive Discharge:  $2,000,000

**{¶24}**  The jury also found that Lucarell was entitled to punitive damages in the amounts of $5 million on the misappropriation claim, $11 million on the retaliation claim, and $20 million on the constructive discharge claim.  And it found Lucarell was entitled to recover attorneys' fees and costs, with the amount to be determined by the trial court.

**{¶25}**  Nationwide filed several post-trial motions including a motion requesting the trial court reduce the verdict to conform to the statutory caps on punitive and non-economic damages.  The trial court found this motion to have merit as to the retaliation claim but not as to the misappropriation and constructive discharge claims.

**{¶26}**  Therefore, the court reduced the non-economic damages awarded on the retaliation claim from $400,000 to $250,000 and reduced the punitive damages awarded on the retaliation claim from $11 million to $800,000.  It also found that the $5.7 million in lost profits damages was excessive and reduced this amount to $2.817 million, which was the amount testified to by Lucarell's expert witness.  It also remitted the other punitive damages awards to result in a total punitive damages award of $10.8 million.  Per stipulation of the parties, the court further reduced the punitive damages award to $10.5 million.

**{¶27}**  After the reductions and remittiturs, Lucarell's final award was $3,667,010 in compensatory damages and $10.5 million in punitive damages for a total award of $14,167,010.

**{¶28}**  The trial court then awarded $187,546.50 in attorney fees and $21,557.64 in costs.  It also awarded prejudgment interest.

**{¶29}**  Nationwide filed a motion for judgment notwithstanding the verdict (JNOV) on all counts and a motion for a new trial.  The trial court overruled these

motions.

{¶30} Nationwide filed a timely notice of appeal on May 10, 2013. Lucarell filed a timely notice of cross appeal on May 20, 2013.

{¶31} Nationwide also filed a Civ.R. 60(B) motion for reconsideration in the trial court requesting that the court reconsider its ruling on the issue of prejudgment interest. This court issued a limited remand to the trial court so that it could rule on that motion. The trial court overruled Nationwide's motion. Nationwide then filed a second notice of appeal. This court consolidated the two appeals.

**Nationwide's Appeal**

{¶32} Nationwide now raises eleven assignments of error for our review, the first of which states:

THE TRIAL COURT ERRED BY NOT GRANTING JNOV ON LUCARELL'S CONSTRUCTIVE DISCHARGE CLAIM.

{¶33} Nationwide argues the trial court should have granted a JNOV on Lucarell's claim for constructive discharge because Lucarell never alleged that she had been subject to any type of discrimination by Nationwide. It asserts a claim for constructive discharge cannot stand alone but is a way for a person to bring a claim in the context of harassment or discrimination when the person quits. Nationwide cites to several federal cases for this proposition. Because Lucarell did not raise a claim for discrimination, Nationwide contends, she could not bring a claim simply for constructive discharge. Under Ohio's employment-at-will status, Nationwide urges, the law does not recognize a cause of action for termination unless the termination is based on improper, discriminatory or retaliatory reasons. Nationwide argues the trial court here expanded Ohio law by providing a stand-alone claim for constructive discharge.

{¶34} An appellate court reviews a trial court's rulings on motions for directed verdict and for JNOV de novo because they present questions of law. *Carter v. R & B Pizza Co.*, 7th Dist. No. 09 JE 34, 2010-Ohio-5937, ¶15.

**{¶35}** Initially, we must note that Lucarell asserts Nationwide failed to preserve this issue for appeal. On the contrary, however, Nationwide did not waive this issue for review. Nationwide raised this issue as early as its Answer to Lucarell's First Amended Complaint, arguing the constructive discharge claim was barred because it was not a proper claim for relief but instead was an element of a discrimination claim. (Answer to First Amended Complaint, ¶71). Nationwide again raised the issue in its Pre-Trial Statement (p. 3) and Proposed Jury Instructions (p. 22). Next, it "implore[d] the court to throw out the constructive discharge claim" when arguing for a directed verdict stating it was not a recognized cause of action. (Tr. 1645). Finally, Nationwide objected to the entire jury instruction on constructive discharge. (Tr. 2082-2083).

**{¶36}** Thus, Nationwide has argued throughout the course of these proceedings that constructive discharge is not an independent claim for relief. As such, it has not waived this issue on appeal.

**{¶37}** In determining whether Lucarell's cause of action for constructive discharge can exist, we must examine Ohio's stance on employment law.

**{¶38}** Ohio is an employment at-will state. *Dohme v. Eurand Am., Inc.*, 130 Ohio St. 3d 168, 2011-Ohio-4609, 956 N.E.2d 825, ¶11. Either party to an employment-at-will agreement may terminate the employment relationship for any reason that is not contrary to law. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). Stated another way, an employee can be terminated for good cause, bad cause, or no cause at all. *Phung v. Waste Mgt., Inc.*, 23 Ohio St.3d 100, 491 N.E.2d 1114 (1986). The act of terminating an at-will employee's relationship with an employer generally does not give rise to an action for damages. *Dohme*, at ¶11.

**{¶39}** Exceptions do exist to the employment at-will relationship.

**{¶40}** The Ohio Supreme Court recognizes exceptions when (1) the existence of an implied or express contract alters the terms of discharge or when (2) representations of continued employment were made to an employee constituting

promissory estoppel. *Sims v. Village of Midvale*, 5th Dist. No. 2012 AP 03 0021, 2012-Ohio-6081, ¶17, citing *Mers*, at 104.

**{¶41}** Additionally, there is an exception for wrongful discharge in violation of public policy. *Sutton v. Tomco Machining, Inc.*, 129 Ohio St. 3d 153, 2011-Ohio-2723, 950 N.E.2d 938, ¶8, citing *Greeley v. Miami Valley Maintenance Contractors., Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), paragraph one of the syllabus. This claim requires the discharged employee to prove: (1) a clear public policy that is manifested in a state or federal constitution, in statute or administrative regulation, or in the common law; (2) dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy; (3) the plaintiff's dismissal was motivated by conduct related to the public policy; and (4) the employer lacked an overriding legitimate business justification for the dismissal. *Sutton*, at ¶9, citing *Collins v. Rizkana*, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653 (1995).

**{¶42}** Finally, there is an exception for discrimination cases. R.C. 4112.02(A) makes it an unlawful discriminatory practice for any employer to discharge an employee without just cause based on the employee's "race, color, religion, sex, military status, national origin, disability, age, or ancestry."

**{¶43}** Notably, in all of these exceptions to the employment at-will doctrine, there is no cause of action for constructive discharge.

**{¶44}** "[C]onstructive discharge is a legal principle frequently applied to employment discrimination cases." *Fleming v. Kent State Univ.*, 10th Dist. No. 13AP-942, 2014-Ohio-3471, ¶21, quoting *Mustafa v. St. Vincent Family Ctrs., Inc.*, 10th Dist. No. 12AP–305, 2012-Ohio-5775, ¶17.

**{¶45}** The comments to the Ohio Jury Instructions instruct that a constructive discharge claim cannot stand alone:

> 1. GENERAL. The employee (resigned) (left his/her job) and claims that he/she was constructively discharged by the employer. The employer claims that the employee voluntarily (resigned) (left the job). If you find by the greater weight of the evidence that the employer,

regardless of his/her/its intent, made the employee's working conditions so difficult and unpleasant that a reasonably (cautious) (careful) (prudent) person under the same or similar circumstances would feel compelled to resign or leave employment, then you must find that the employee was constructively discharged.

OJI CV Section 533.23.

**{¶46}** The comment to this instruction states: "This instruction applies in discrimination cases where the employee also claims that he/she was forced to resign or leave due, in whole or in part, to discriminatory employment practices. '*Constructive discharge' is not an independent claim for relief*." (Emphasis added.) Although the Ohio Jury Instructions are not binding, they are nonetheless helpful as an example of generally accepted interpretations of the law. *State v. Gardner*, 118 Ohio St. 3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶97.

**{¶47}** Moreover, the Sixth Circuit has found: "Constructive discharge from employment is not itself a cause of action. First there must exist an underlying cause of action for employment discrimination." *Starks v. New Par*, 181 F.3d 103 (6th Cir.1999). "Federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128 (1981). Thus, federal case law holds that a constructive discharge claim cannot stand alone.

**{¶48}** Under Ohio law, there is no independent claim for constructive discharge. Constructive discharge occurs when an employee is forced by his or her employer to resign. Constructive discharge is a substitute for being fired.

**{¶49}** Looking at Lucarell's claim, if Nationwide had fired Lucarell, she would not have had a cause of action simply for being fired. That is not to say she could not pursue other claims such as breach of contract or fraud. But she would not have a cause of action in tort just because her employer terminated her employment. Here,

Lucarell's claim for constructive discharge is equivalent to a claim for being fired, which is not a cause of action absent some type of alleged discrimination or violation of public policy.

**{¶50}** Ohio is an at-will employment state where Nationwide was free to fire Lucarell for good reason, bad reason, or no reason at all. Under Ohio law, a constructive discharge claim is not an independent cause of action. Therefore, the trial court erred allowing a judgment on Lucarell's constructive discharge claim.

**{¶51}** Accordingly, Nationwide's first assignment of error has merit.

**{¶52}** Nationwide's second assignment of error states:

THE TRIAL COURT ERRED BY NOT GRANTING JNOV ON LUCARELL'S RETALIATION CLAIM.

**{¶53}** Nationwide's argument here is similar to that in its first assignment of error. Nationwide argues the trial court should have granted a JNOV on Lucarell's retaliation claim because Lucarell never alleged any discrimination by Nationwide. It points out that Lucarell alleged Nationwide's filing of a compulsory counterclaim in response to her complaint constituted unlawful retaliation. Nationwide notes that to bring a retaliation claim, the plaintiff must have engaged in a protected activity under the applicable statute. But Nationwide asserts Lucarell never claimed to have engaged in a protected activity. Additionally, Nationwide states a retaliation claim cannot be based on the filing of a counterclaim unless the counterclaim is objectively baseless. Nationwide asserts its counterclaim was objectively reasonable because it sought to collect on a loan that Lucarell admitted she defaulted on.

**{¶54}** Lucarell once again asserts that Nationwide waived this issue for review by failing to preserve it at trial. But as was the case with the constructive discharge claim, Nationwide repeatedly raised objections to Lucarell's retaliation claim. It first did so in its Opposition to Lucarell's Motion for Leave to File First Amended Complaint, where it argued Lucarell did not engage in a protected activity as required to raise a retaliation claim. Nationwide again raised this argument in its Motion for

Summary Judgment, Pre-Trial Statement, and Proposed Jury Instructions. And Nationwide raised the issue during trial when arguing for a directed verdict. (Tr. 1673). Thus, Nationwide did not waive this issue on appeal.

**{¶55}** Pursuant to R.C. 4112.02(I), which deals with retaliation claims, it is an unlawful discriminatory practice for any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections R.C. 4112.01 to R.C. 4112.07 (all dealing with discrimination).

**{¶56}** To establish a prima facie case of retaliation pursuant to R.C. 4112.02(I), the plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) the employer knew she engaged in the protected activity; (3) the employer subjected the plaintiff to an adverse employment action; and (4) a causal link existed between the protected activity and the adverse action. *Dautartas v. Abbott Labs.*, 10th Dist. No. 11AP-706, 2012-Ohio-1709, ¶49.

**{¶57}** Lucarell argues that she engaged in a protected activity here by retaining counsel and filing suit. She relies on this court's decision in *Jenkins v. Parkview Counseling Ctr., Inc.*, 7th Dist. No. 99 CA 60, 2001-Ohio-3151, for support.

**{¶58}** In *Jenkins*, Jenkins filed a lawsuit against his employer alleging his employer changed his job classification in violation of a settlement agreement. The matter went to a jury trial and the jury found in favor of Jenkins. Two years later, Jenkins was laid off and never recalled to work. He then filed a lawsuit against his former employer asserting claims for age discrimination, breach of contract, malice, and wrongful discharge in violation of public policy. The trial court granted summary judgment in favor of the employer and Jenkins appealed.

**{¶59}** In his claim for wrongful discharge against public policy, Jenkins alleged he was discharged in retaliation for his successful lawsuit against his employer. On appeal, this court stated that "when an employer discharges an employee for consulting an attorney regarding an issue that affects the employer's business

interests, the employer has violated clear public policy in Ohio." *Id.*, citing *Chapman v. Adia Services, Inc.*, 116 Ohio App.3d 534, 542, 688 N.E.2d 604 (1997). We found the public policy was clearly stated in Article I, Section 16 of the Ohio Constitution, which provides that all courts shall be open to every person to redress his injuries. *Id.* Therefore, we determined that the trial court erred in granting summary judgment to the employer on Jenkins' wrongful discharge claim.

**{¶60}** This case, however, is distinguishable from *Jenkins*. Jenkins asserted a claim for wrongful discharge in violation of public policy. Lucarell did not. Instead, she raised a claim for "retaliation in violation of public policy." But no such claim exits. Moreover, Lucarell has never claimed that she was discriminated against by Nationwide. And Nationwide did not fire Lucarell in retaliation for her filing suit against it. Lucarell had not been Nationwide's employee for almost a year when she filed the instant lawsuit.

**{¶61}** In this case, there was no adverse employment action. Lucarell's employment with Nationwide terminated on July 7, 2009. She filed her complaint on April 12, 2010. Nationwide filed its counterclaim on June 15, 2010, almost an entire year after Lucarell's employment ended. Thus, Nationwide did not subject Lucarell to an adverse employment action.

**{¶62}** Lucarell's retaliation claim fails for two reasons. First, Lucarell was not an employee at the time of the alleged retaliation. Therefore, there was not an adverse employment action. Second, Lucarell failed to assert any type of discrimination. The retaliation statute itself presupposes some type of discrimination: "it is an unlawful discriminatory practice for any person to discriminate in any manner against any other person *because* that person has opposed any unlawful discriminatory practice or *because* that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections R.C. 4112.01 to R.C. 4112.07 [all dealing with discrimination]." (Emphasis added.) Throughout these proceedings, Lucarell has never suggested any type of discrimination.

**{¶63}** Lucarell's claim did not meet the elements of retaliation. Therefore, the trial court erred in allowing a judgment on Lucarell's retaliation claim.

**{¶64}** Accordingly, Nationwide's second assignment of error has merit.

**{¶65}** Nationwide's third assignment of error states:

**{¶66}** THE TRIAL COURT ERRED BY NOT GRANTING JNOV OR A NEW TRIAL ON LUCARELL'S BREACH-OF-CONTRACT CLAIMS.

**{¶67}** Lucarell raised breach of contract claims asserting Nationwide breached the AE Agreement, the Modified AE Agreement, the MOU, and the Agent Agreement. Nationwide moved for a directed verdict on these claims. The trial court found:

> And I'm indicating here specifically, while the court has listened to arguments of the defense with respect to the position of the defense, that there's a failure of precise proof of breach. I would remind the parties as far as this case is concerned, that in every contract there is a presumption that the parties will act in good faith. And the allegations that have been made by the plaintiff under the court's analysis, the jury could find that the defendant acted otherwise than in good faith in these dealings if the allegations were to be believed. So this is the reason that the plaintiff has survived the motion in Counts 1, 2, and 3 [the breach of contract claims].

(Tr. 1661).

**{¶68}** Nationwide argues that the trial court found there was no express breach of contract and that without an express breach of a contract, there can be no claim for breach of the duty of good faith and fair dealing. Therefore, it asserts, the trial court erred in sending these claims to the jury after finding there was no express breach by Nationwide. Because there was no express breach, Nationwide asserts, the claims for breach of the duties of good faith and fair dealing necessarily failed.

**{¶69}** There is an implied duty of good faith and fair dealing in every contract. *Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 2005-Ohio-4850, 839 N.E.2d 49, ¶27. "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St. 3d 433, 443-444, 662 N.E.2d 1074, quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357-1358 (C.A.7, 1990). A claim for breach of the duty of good faith and fair dealing exists as part of a breach of contract claim. *Krukrubo v. Fifth Third Bank*, 10th Dist. No. 07AP-270, 2007-Ohio-7007, ¶19. In other words, a party cannot assert a claim for breach of the duty of good faith without asserting a claim for breach of contract. *Gilchrist v. Saxon Mtge. Servs.*, 10th Dist. No. 12AP-556, 2013-Ohio-949, ¶26.

**{¶70}** The trial court's comment may suggest it did not find that Lucarell presented evidence to prove an actual breach of contract. Nonetheless, the trial court instructed the jury:

> A party cannot breach the implied duty of good faith by acting as permitted by the terms of the contract. Rather, to breach the implied covenant of good faith and fair dealing, a party must have breached specific obligations imposed by the contract.
>
> For you to find for Ms. Lucarell on this claim, you must find by a preponderance of the evidence that the obligations allegedly breached were part of the performance agreement and modification; (2) that Nationwide materially breached these obligations[.]

(Tr. 2062-2063).

**{¶71}** The jury interrogatories reveal that the jury found Nationwide breached the AE Agreement, the Modified AE Agreement, the MOU, and the Agent Agreement. (Jury Interrogatories 3, 4, 5, 6). They do not specify whether the breach was based upon a breach of specific terms of the contracts, a breach of the duty of good faith

and fair dealing that accompanies a contract, or both. The parties did not submit interrogatories as to why the jurors found breaches of the contracts. Thus, there is no way to know on what basis the jury found the breaches. Therefore, we cannot review this claim of error.

{¶72} Nationwide also argues that any alleged breach of the MOU was released when Lucarell signed the Modified AE Agreement in the fall of 2008. The Modified AE Agreement contained a release of all claims against Nationwide up until that point in time. (Pt. Ex. 15, ¶19). Lucarell claimed Nationwide breached the MOU in May 2007, by failing to accept her business plan. (Tr. 1321-1323, 1654-1655, 1944-1945).

{¶73} Whether a release actually releases all claims is a question of fact. See, *Pakulski v. Garber*, 6 Ohio St.3d 252, 256, 452 N.E.2d 1300 (1983); *Sloan v. Std. Oil Co.*, 117 Ohio St. 149, 152, 203 N.E.2d 236 (1964). In this case, the jury was presented with two interrogatories relating to the release at Nationwide's request.

{¶74} Jury Interrogatories No. 1 and 2 asked:

> Do you find that Nationwide has proven by a preponderance of the evidence that Christine Lucarell released Nationwide from all claims pursuant to the Memorandum of Understanding prior to the execution of the Memorandum of Understanding?
>
> Do you find that Nationwide has proven by a preponderance of the evidence that Christine Lucarell released Nationwide from all claims pursuant to the First Modification of the Agency Executive Program Performance Agreement prior to the execution of the First Modification of the Agency Executive Program Performance Agreement?

The jury answered "No" to both interrogatories, which were both proposed by Nationwide. (Nationwide Proposed Jury Interrogatories 1 and 2). Thus, the parties agreed to submit the issue to the jury. And the jury found the releases did not

actually release all claims.

**{¶75}** Finally, Nationwide argues the trial court should have granted its motion for a new trial on the breach of contract claims due to the court's instruction on duress.

**{¶76}** Over Nationwide's objection, the trial court instructed the jury that Lucarell was "excused from performing the contract" if she entered into the MOU or the Modified AE Agreement under duress. (Tr. 2076-2077).

**{¶77}** Nationwide asserts the duress instruction allowed the jury to find duress by a preponderance of the evidence. However, it argues, duress must be proven by clear and convincing evidence. Nationwide points out that the trial court refused to give its proposed duress instruction, which instructed on proof by clear and convincing evidence. (Nationwide Proposed Instr. No. 10). Nationwide urges that the failure to instruct on the correct burden of proof is reversible error. It asserts that the jury may have found for Lucarell on her breach of contract claims only after excusing her failure of performance under those contracts.

**{¶78}** The trial court instructed the jury on two defenses for Lucarell that would have excused her from performing under the contracts. First, it instructed the jury on prevention of performance:

> Now, Ms. Lucarell claims that she is excused from performing under the contracts for her agency because Nationwide prevented her from performing, fulfilling, and/or completing a condition that would have excused her from loan repayment obligations. If all the requirements of prevention of performance are proved, then Ms. Lucarell is excused from performing under the contracts.
>
> Prevention of performance occurs if, (A) Nationwide prevented Ms. Lucarell from performing under the contracts at issue; and (B), Ms. Lucarell would have been able to perform under the contracts, but for Nationwide's actions. All right?

(Tr. 2075-2076). The trial court then instructed the jury on duress. (Tr. 2076). It did not include an instruction that duress must be proved by clear and convincing evidence.

**{¶79}** There are different views in Ohio on the proper burden of proof to prove duress. For example, the Ninth District required that a party claiming duress prove its existence by a preponderance of the evidence. *ComDoc v. Advance Print Copy Ship Ctr.*, 9th Dist. No. 24212, 2009-Ohio-2998, ¶22. But several other districts have required proof by clear and convincing evidence. *Betts v. Betts*, 3d Dist. No. 5-12-33, 2013-Ohio-1938, ¶13 (finding that while the Ohio Supreme Court has not clearly weighed in on the appropriate burden of proof for a showing of duress, it hinted in *Standard Sanitary Mfg. Co. v. George*, 118 Ohio St. 564 (1928), that it requires a party to prove duress by clear and convincing evidence); *Beery v. Beery*, No. 82AP-474, 1983 WL 3321, *1 (Jan. 20, 1983); *Thiery v. Thiery*, 8th Dist. No. 52077, 1987 WL 6117, *1 (Feb. 5, 1987).

**{¶80}** The trial court in this case did not instruct on clear and convincing evidence to prove duress. This may have been in error.

**{¶81}** But there were no jury interrogatories as to why the jury found that Lucarell was excused from performing under the contracts. Hence, we cannot know whether the jury actually found that Lucarell acted under duress or whether it found she was excused based on prevention of performance. In cases such as this, we apply the two-issue rule. The two-issue rule holds that,

> where there are two causes of action, or two defenses, thereby raising separate and distinct issues, and a general verdict has been returned, and the mental processes of the jury have not been tested by special interrogatories to indicate which of the issues was resolved in favor of the successful party, it will be presumed that all issues were so determined; and that, where a single determinative issue has been tried free from error, error in presenting another issue will be disregarded.

*M & M Winfield, L.L.C. v. Huntington Mtge. Co.*, 5th Dist. No. 2014 AP 07 0027, 2015-Ohio-583, ¶20,quoting *H.E. Culbertson Co. v. Warden*, 123 Ohio St. 297, 303 (1931).

**{¶82}** There was no error in the prevention of performance instruction and the jury may have based its decision on that instruction. Therefore, based on the two-issue rule, we cannot find error because there was an alternate ground on which the jury could properly base its conclusion. Consequently, any error the trial court may have made in leaving out the clear and convincing burden of proof for duress was harmless. Thus, this was not a basis for a new trial on the breach of contract claims.

**{¶83}** Accordingly, Nationwide's third assignment of error is without merit.

**{¶84}** Nationwide's fourth assignment of error states:

THE TRIAL COURT ERRED BY NOT GRANTING JNOV ON LUCARELL'S CLAIM FOR INVASION OF PRIVACY.

**{¶85}** In her invasion of privacy claim, Lucarell asserted that Nationwide misappropriated her name by continuing to print her name on notices that it sent to her former customers, which misrepresented that she was still a Nationwide agent.

**{¶86}** In this assignment of error, Nationwide asserts that Lucarell could not bring an invasion of privacy claim based on the same underlying conduct as her breach of contract claim. Because Lucarell's invasion of privacy claim was based on the same conduct as her breach of the Agent Agreement claim, Nationwide asserts the trial court should have granted a JNOV on the invasion of privacy claim. Nationwide points out that its duties concerning the use of Lucarell's name were governed by the Agent Agreement. (Pl. Ex. 11).

**{¶87}** Generally, when a contract action exists against a defendant, the plaintiff cannot maintain a tort claim based upon the same underlying actions as the breach of contract claim unless the defendant also breached a duty owed independent of the contract. *Evans Landscaping, Inc. v. Stenger*, 1st Dist. No. C-110104, 2011-Ohio-6033, ¶16. A tort claim based upon the same actions as those

upon which a breach of contract claim is based will exist independently of the contract action if the breaching party also breaches a duty owed separately from that created by the contract. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 151, 684 N.E.2d 1261 (1996). In other words, the tort claim must be based on a duty that would be owed even if no contract existed. *Id.*

**{¶88}** In this case, Lucarell's invasion of privacy claim (tort claim) exists independently from her breach of contract claim.

**{¶89}** Lucarell's breach of contract claim arose from her allegation that Nationwide breached the Agent Agreement. The Agent Agreement provided in relevant part:

> Your name may be printed for your benefit on billings and materials received by our policyholders. If this Agreement is canceled, your name will be removed as soon as practical, but you acknowledge that occasional error may cause it to continue to be printed.

(Pt. Ex. 11). Lucarell's breach of contract claim was based on her allegation that Nationwide breached its contractual duty to remove her name from its communications to its policyholders.

**{¶90}** Lucarell's invasion of privacy claim, while based on the same conduct by Nationwide, arose from a common law duty not to misappropriate her name. Ohio recognizes several different tort claims for invasion of privacy. *Kalbfell v. Marc Glassman, Inc.*, 7th Dist. No. 02 CO 5, 2003-Ohio-3489, ¶34, citing *Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340 (1956). The invasion of privacy claim raised by Lucarell was for misappropriation of a name or likeness. *Id.* Even if no contract existed between Lucarell and Nationwide, Lucarell could still maintain this invasion of privacy claim against Nationwide for failing to remove her name from its communications to its policyholders. In the same way, even if her invasion of privacy claim did not exist, Lucarell could still maintain her breach of contract claim against Nationwide for breaching its contractual duty to remove her name from its

communications to policyholders. Thus, the trial court did not err in refusing to grant a JNOV on Lucarell's invasion of privacy claim.

**{¶91}** Accordingly, Nationwide's fourth assignment of error is without merit.

**{¶92}** Nationwide's fifth assignment of error states:

> THE TRIAL COURT ERRED BY ADMITTING SPECULATIVE LOST-PROFITS TESTIMONY ON LUCARELL'S BREACH-OF-CONTRACT AND CONSTRUCTIVE DISCHARGE CLAIMS AND BY NOT GRANTING JNOV GIVEN HER FAILURE TO PROVE LOST PROFITS TO A REASONABLE CERTAINTY.

**{¶93}** Nationwide states here that Lucarell's only evidence of lost profits was the testimony of Shelley Aaserud. Nationwide finds fault with Aaserud's testimony because she was not a financial expert or an accountant but was instead a former Nationwide employee with an "axe to grind" against Nationwide. (Tr. 1077-1078, 1082-1084, 1086). Nationwide claims Aaserud's testimony was insufficient to prove lost profits to a reasonable degree of certainty, therefore, the trial court should not have permitted it. And because damages are an element of a contract claim and Aaserud's testimony was Lucarell's only evidence of contract damages, Nationwide argues, the trial court should have granted a JNOV on the contract claims.

**{¶94}** More specifically, Nationwide argues that Aaserud's testimony failed to meet Evid.R. 702's requirements for expert witness testimony. A witness may testify as an expert, pursuant to Evid.R. 702, if:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

Nationwide argues that Aaserud's testimony failed to meet Evid.R. 702(B) and (C).

**{¶95}** Aaserud prepared a 25-year pro forma business plan for Lucarell's agency and testified that Lucarell was entitled to $2,817,096.44 in lost profits based on that pro forma. (Pt. Ex. 88, p. 13). Nationwide argues this business plan lacked reliability because (1) Aaserud did not use industry standards to create it; (2) a business plan could not project lost profits 25 years into the future; (3) the business plan assumed losses of $1 million in the first ten years and Aaserud could not say where Lucarell would come up with $1 million to stay afloat; (4) businesses must have a historic record of profitability before a plaintiff can recover lost profits, which Lucarell did not have; (5) Aaserud forgot to offset the income Lucarell would earn if she was not a Nationwide agent; and (6) Lucarell's contracts with Nationwide were cancellable at-will by either party, thus a 25-year projection was unreasonable.

**{¶96}** A trial court's determination of whether an individual qualifies as an expert will only be overturned by an appellate court for an abuse of discretion. *State v. Hartman*, 93 Ohio St.3d 274, 285, 2001-Ohio-1580, 754 N.E.2d 1150; *State v. Baston*, 85 Ohio St.3d 418, 423, 709 N.E.2d 128 (1999). Abuse of discretion connotes more than an error of law or judgment; it implies the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶97}** Under Evid.R. 702(B), the individual offered as an expert need not have complete knowledge of the field in question, or for that matter, be the best witness on the subject. *Hartman*, 93 Ohio St.3d at 287; *Baston*, 85 Ohio St.3d at 423. The test is whether the witness offered as an expert possesses knowledge that will aid the trier of fact in performing its fact-finding function. *Hartman*, 93 Ohio St.3d at 287.

**{¶98}** Aaserud testified that she was employed by Nationwide as an "agency business consultant" from 2000 until June 2008. (Tr. 972). As an agency business consultant Aaserud's duties included meeting with Nationwide agents, looking at their

reports, and making recommendations for improvement. (Tr. 972-973). She also prepared pro formas and business plans for many of the agents. (Tr. 973). Aaserud explained that a pro forma is an analysis of the revenues that are being produced within an agency, either currently or historically, which are then used to project into the future. (Tr. 974-975). In coming up with a pro forma, Aaserud explained that certain assumptions are used including the retention of prior business, the average premiums, and the new business production expectations. (Tr. 975-976). She stated that during her time at Nationwide, she prepared hundreds of pro formas. (Tr. 976). She also stated that she worked with hundreds of agents, including scratch agents who started their business "from nothing, one policy at a time." (Tr. 977). Aaserud testified that she used Nationwide's template for pro formas and then input information specific to a particular agency to come up with its pro forma. (Tr. 980-981). She stated that in preparing her pro forma for her expert report in this case she used this same template approved by Nationwide. (Tr. 981).

**{¶99}** Aaserud's explanation of her qualifications and experience demonstrate that she possessed knowledge that could aid the jury in its fact-finding function. She worked for eight-and-a-half years preparing pro formas for Nationwide. She used the same template in preparing the pro forma that was the basis of her testimony in this case. Her testimony was based on specialized knowledge gained during her years of experience in the insurance business. Moreover, any evidence of Aaserud's potential bias against Nationwide would go to the weight and credibility of her testimony, not its admissibility. Likewise, any evidence that Lucarell's future profits would be offset by her future earnings would also go to the weight of Aaserud's testimony. Thus, the trial court did not err in allowing Aaserud to offer expert testimony as to Lucarell's lost profits.

**{¶100}** Nationwide also argues here that Lucarell failed to offer any evidence of damages for her breach of the Agent Agreement claim. The jury awarded Lucarell $600,000 in lost profits for breach of the Agent Agreement. Nationwide argues, however, that Lucarell's theory of lost profits had nothing to do with the alleged

breach of the Agent Agreement. It asserts Lucarell's sole theory of breach of the Agent Agreement was that Nationwide improperly used her name on correspondence after she left Nationwide. This claimed breach, Nationwide argues, had nothing to do with the lost profit calculation. Therefore, because Lucarell failed to put forth any evidence of damages as to her breach of the Agent Agreement, Nationwide contends the trial court should have granted a JNOV on this claim.

{¶101} Lost profits can be recovered in a breach of contract action if (1) the profits were within the parties' contemplation at the time they entered the contract, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty. *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883 (1984), paragraph two of the syllabus.

{¶102} In this case, Aaserud presented the expert testimony of Lucarell's lost profits. According to Aaserud's 25-year pro forma and calculations, Lucarell's lost profits were $2.817 million. (Tr. 1043-1045). In forming this opinion, Aaserud relied in part on the pro forma that she prepared, the AE Performance Agreement, the Modified AE Agreement, and a results tracker sent to AE agents by Nationwide. (Tr. 1046-1051). She testified that in preparing her expert report, she reviewed all of the respective contracts and performance agreements with respect to Lucarell's agency. (Tr. 1013-1014).

{¶103} Aaserud did not break down her lost profits opinion into certain amounts that would correspond with each of Lucarell's four breach of contract claims. In other words, she did not testify that a certain amount of lost profits was attributable to Nationwide's breach of the AE Performance Agreement, a certain amount of lost profits was attributable to Nationwide's breach of the MOU, etc.

{¶104} The jury was presented with four breach of contract claims. It found in Lucarell's favor on each of the claims and awarded damages on each of the claims. The total damage award from the jury on the breach of contract claims was $4.2 million. The trial court reduced this award to $2.817 million, which included the

compensatory damage awards for all breach of contract claims plus the compensatory damage award for constructive discharge.

**{¶105}** Aaserud specifically stated that in calculating Lucarell's damages, she reviewed *all* of the contracts and performance agreements for Lucarell's agency. Thus, Aaserud necessarily reviewed the Agent Agreement and considered it in arriving at her total figure of Lucarell's damages. Thus, we cannot find error with Aaserud's testimony here.

**{¶106}** Accordingly, Nationwide's fifth assignment of error is without merit.

**{¶107}** Nationwide's sixth assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO APPORTION THE COMPENSATORY DAMAGE AWARD AND IN ITS CALCULATION OF THAT AWARD.

**{¶108}** The jury awarded Lucarell $5.7 million in compensatory damages. The trial court reduced that award to $2.817 million.

**{¶109}** Nationwide argues that while the trial court was correct in reducing the compensatory damage award, it was wrong to use the $2.817 million figure, which was Aaserud's lost-profits figure. It again asserts that Aaserud's testimony was unreliable. It further asserts that Aaserud failed to subtract the income that Lucarell would actually earn over the next 25 years. Nationwide points to Lucarell's counsel's statement to the jury that: "we can make a reasonably substantial estimation that she [Lucarell] will earn $800,000 over those 25 years. So if you deduct the 800,000 from the 2.8 million that Shelley Aaserud said she would have earned, she gets $2 million." (Tr. 1969). Thus, Nationwide asserts, the trial court's award exceeds that which the plaintiff's counsel believed the evidence supported.

**{¶110}** We review a trial court's remittitur of damages for abuse of discretion. *Brady v. Miller*, 2d Dist. No. 19723, 2003-Ohio-4582, ¶5.

**{¶111}** The trial court found that the jury's compensatory award was excessive and exceeded "the maximum amount that a jury could reasonably find to

be compensatory." Therefore, the court remitted the compensatory damages to $2.817 million, finding this was the maximum a jury could reasonably find to be compensatory per Aaserud's testimony. The court stated this amount represented the sums collectively awardable on the claims for breach of the Agent Agreement, the AE Agreement, the MOU, and the Modified AE Agreement, as well as the claim for constructive discharge.

{¶112} The trial court did not abuse its discretion in remitting the jury's compensatory award from $5.7 million to $2.817 million. There was no evidence to support a compensatory award of $5.7 million. The largest amount of compensatory damages the evidence supported was $2.817 million. Aaserud testified that the present-day value of Lucarell's lost profits was $2.817 million. (Tr. 1045-1046). The trial court simply took the large jury award and reduced it to the highest amount that was supported by the evidence.

{¶113} Additionally, Nationwide argues the trial court failed to apportion the compensatory damages among the five claims.

{¶114} The jury apportioned the compensatory damages among the five claims. The trial court reduced the total amount to $2.817 million without apportioning the award among the claims.

{¶115} Nationwide claims prejudice from the trial court's failure to apportion the award among the claims. It contends that if this court upholds some, but not all, of the awards on appeal, it will be unclear what the damages are.

{¶116} We have already determined that the constructive discharge verdict is to be reversed. We have also determined that the verdicts on the four breach of contract claims are to be upheld. Thus, we must uphold the damages on the breach of contract claims and reverse the damages on the constructive discharge claim.

{¶117} The trial court did not apportion the $2.817 million in compensatory damages among the five claims. But the jury did apportion its award among the claims. Therefore, it is reasonable to apportion the court's $2.817 million in the same percentages that the jury did.

**{¶118}** On the breach of the AE Agreement, the jury awarded $600,000 in compensatory damages. This was 10.526% of the $5.7 million award. That same percentage of the trial court's $2.817 million award is $296,517.42.

**{¶119}** On the breach of the Modified AE Agreement, the jury awarded $2 million. This was 35.088% of the total award. That same percentage of the trial court's total award is $988,428.96.

**{¶120}** On the breach of the Agent Agreement, the jury awarded $600,000. This was 10.526% of the total award. That same percentage of the trial court's award is $296,517.42.

**{¶121}** On the breach of the MOU, the jury awarded $1 million. This was 17.544% of the total award. That same percentage of the trial court's award is $494,214.48.

**{¶122}** And on the constructive discharge claim, the jury awarded $1.5 million. This was 26.316% of the total award. That same percentage of the trial court's award is $741,321.72.

**{¶123}** Therefore, in order to arrive at Lucarell's total compensatory damage award now that we have determined that the judgment on the constructive discharge claim is to be reversed, we simply subtract the $741,321.72 for the constructive discharge claim (or 23.316% of the total amount, which the jury originally awarded) from the court's $2.817 million award. We then leave intact the remainder of the award, which is: $296,517.42 on the breach of the AE Agreement (10.526% of the total amount); $988,428.96 on the breach of the Modified AE Agreement (35.088% of the total amount); $296,517.42 on the breach of the Agent Agreement (10.526% of the total amount); and $494,214.48 on the breach of the MOU (17.544% of the total amount). By applying this formula, we preserve the jury's apportionment of the damages. This leaves Lucarell with a total compensatory damage award of $2,075,678.28 on the four breach of contract claims.

**{¶124}** Accordingly, Nationwide's sixth assignment of error is without merit.

**{¶125}** Nationwide's seventh assignment of error states:

THE TRIAL COURT ERRED BY NOT GRANTING JNOV ON THE PUNITIVE DAMAGE AWARD ON LUCARELL'S CLAIM FOR INVASION OF PRIVACY.

**{¶126}** On the invasion of privacy claim, the court entered judgment in favor of Lucarell for $10 in nominal damages, $100,000 in emotional distress damages, and $2 million in punitive damages (which the court remitted from the $5 million awarded by the jury).

**{¶127}** In this assignment of error, Nationwide claims that the $2 million in punitive damages cannot be sustained because Lucarell failed to prove actual malice. It argues that one cannot infer actual malice from the fact that Lucarell's name appeared on five computer-generated letters in the months after Lucarell left Nationwide. And it notes that the Agent Agreement even contemplated that such an error was possible. (Pl. Ex. 11, ¶14).

**{¶128}** A jury may award punitive damages only upon a finding of actual malice. *Calmes v. Goodyear Tire & Rubber Co.*, 61 Ohio St.3d 470, 473, 575 N.E.2d 416 (1991). "Actual malice" has been defined as "'(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. (Emphasis sic.)'" *Id.*, quoting *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987), syllabus.

**{¶129}** Lucarell presented evidence that Nationwide failed to remove her name from some of its communications with policyholders for almost a year. She specifically submitted correspondence from Nationwide to various clients dated November 2, 2009; February 14, 2010; March 15, 2010; September 4, 2009; and March 22, 2010, listing Lucarell as the agent involved and providing her agent number and phone number. (Pl. Ex. 39, 40, 41, 42, 43). Nationwide Licensing Process Consultant, Daniel Baker, agreed this was a potential benefit to Nationwide because the policyholders who liked Lucarell would still believe she was their agent. (Tr. 752). Baker also testified that Lucarell's name could have been removed from

Nationwide's correspondence much sooner than it was. (Tr. 764).

**{¶130}** In addition to the specific evidence of how the invasion of privacy claim occurred, Lucarell presented evidence throughout the trial as to Nationwide's malicious actions towards her. For example, Lucarell testified that Nationwide had promised that she could merge her agency with two other agencies in order to help meet her productions goals. (Tr. 1325-1326). But, she testified, that Nationwide did not allow the mergers even though her pro forma and business plan counted on them. (Tr. 1326, 1330). Additionally, Lucarell provided evidence that Nationwide accelerated the repayment of her loan and took all of her commissions, cutting off her cash flow. (Pl. Ex. 38; Tr. 910). And Lucarell provided testimony that Nationwide claimed she signed new loan documents, even though she never did. (Tr. 1355). Lucarell also testified that Nationwide failed to include her in conversations and plans dealing with her own agency. (Tr. 1348).

**{¶131}** Standing alone, Nationwide's failure to remove Lucarell's name and contact information from its correspondence may not demonstrate that Nationwide's conduct was characterized by hatred, ill will, or a spirit of revenge. But when it is considered along with the rest of the evidence in this case, there was sufficient evidence from which the jury could conclude that Nationwide acted with actual malice in misappropriating Lucarell's name.

**{¶132}** Accordingly, Nationwide's seventh assignment of error is without merit.

**{¶133}** Nationwide's eighth assignment of error states:

THE TRIAL COURT LACKED JURISDICTION TO AWARD EMOTIONAL DISTRESS AND PUNITIVE DAMAGES THAT EXCEEDED STATUTORY CAPS IN THE TORT-REFORM ACT.

**{¶134}** The jury awarded $1 million in emotional distress damages: $100,000 for invasion of privacy, $400,000 for retaliation, and $500,000 for constructive discharge. The trial court reduced the emotional distress damages on the retaliation

claim to $250,000. It left the other two awards in place. Thus, the total emotional distress damages award was $850,000.

**{¶135}** First, Nationwide asserts that pursuant to the tort-reform statutes, the maximum possible award for noneconomic loss in this case is $350,000. It takes issue with the trial court's determination that the constructive discharge and invasion of privacy claims were not covered by the tort reform act and, therefore, not subject to the cap.

**{¶136}** We have already determined that the trial court should not have allowed Lucarell's claims for constructive discharge and retaliation. Necessarily then, the emotional distress damages on these claims cannot stand. This leaves only the emotional distress damages of $100,000 on the invasion of privacy claim at issue in this assignment of error.

**{¶137}** R.C. 2315.18(B)(2) provides that, except in certain limited situations, the amount of compensatory damages for noneconomic loss in a tort action shall not exceed the greater of (1) $250,000, or (2) an amount that is equal to three times the economic loss, as determined by the trier of fact, to a maximum of $350,000 for each plaintiff or a maximum of $500,000 for each occurrence that is the basis the action. An "occurrence" is defined as "all claims resulting from or arising out of any one person's bodily injury." R.C. 2315.18(A)(5). The trial court does not have jurisdiction to enter an award for noneconomic loss that exceeds the limits set forth in the statute. R.C. 2315.18(F)(1).

**{¶138}** Because the emotional distress awards on the constructive discharge and retaliation claims cannot stand, that leaves only the $100,000 emotional distress award on the invasion of privacy claim. This award is below the $250,000 limit set out in R.C. 2315.18(B)(2). Thus, it complies with the statutory cap.

**{¶139}** Second, Nationwide argues the trial court lacked jurisdiction to enter a punitive damage award of more than twice the compensatory damage award.

**{¶140}** The trial court reduced the jury's $36 million punitive damages award to $10.5 million. It awarded $8 million for constructive discharge, $500,000 for

retaliation, and $2 million for invasion of privacy. The total compensatory damage award was $3,667,010.00.

**{¶141}** Regarding punitive damages in a tort action, R.C. 2315.21(D)(2)(a) provides that "[t]he court shall not enter judgment for punitive or exemplary damages in excess of two times the amount of the compensatory damages awarded to the plaintiff from that defendant, as determined pursuant to division (B)(2) or (3) of this section."

**{¶142}** Now we are left only to examine the punitive damages as to the invasion of privacy claim. The total compensatory damage award on the invasion of privacy claim was $100,010 ($100,000 in emotional distress damages plus $10 in nominal damages). The punitive damage award on the invasion of privacy claim was $2 million. Two times the compensatory damages is $200,020. Therefore, it was error for the trial court to award punitive damages on the invasion of privacy claim that exceeded the $200,020 statutory cap.

**{¶143}** Accordingly, Nationwide's eighth assignment of error has merit in part.

**{¶144}** Nationwide's ninth assignment of error states:

THE TRIAL COURT ERRED BY NOT FURTHER REDUCING THE CONSTITUTIONALLY EXCESSIVE PUNITIVE DAMAGE AWARDS.

**{¶145}** Nationwide's argument here focuses on the constructive discharge punitive damage award. It points out that the jury awarded $1.5 million in lost profits on this claim. It asserts the trial court unconstitutionally increased this award to $2.817 million. Additionally, Nationwide argues, any punitive damages award greater than a 1:1 ratio to compensatory damages violates due process because the compensatory damage award is so substantial.

**{¶146}** Because Lucarell's constructive discharge judgment cannot stand, this assignment of error is moot.

**{¶147}** Nationwide's tenth assignment of error states:

THE TRIAL COURT ERRED BY NOT GRANTING A DIRECTED VERDICT OR A NEW TRIAL FOR NATIONWIDE ON ITS COUNTERCLAIM.

{¶148} Nationwide raised a counterclaim for breach of contract asserting Lucarell failed to pay the NFCU note.

{¶149} Nationwide states that the evidence was uncontroverted that it paid Lucarell's debt to the bank and was assigned the note. (Tr. 879-882). And it states that Lucarell did not dispute that she owed $291,296.53 on the note. Because her debt was undisputed, Nationwide contends it was entitled to a judgment as a matter of law or, at the least, to a new trial on its counterclaim.

{¶150} Nationwide employee John Mincy testified that Nationwide was assigned Lucarell's Note. (Tr. 880-881). He stated that the balance on the Note is $274,285.22. (Tr. 882). There was no evidence to the contrary on this point.

{¶151} But Lucarell presented evidence throughout the course of the trial that convinced the jury that even though she technically may have defaulted on her loan, she should not be obligated to pay the balance due on the Note due to Nationwide's actions, which prevented her from successfully completing the AE Program.

{¶152} Jury Interrogatory No. 15 asked:

Do you find that Nationwide has proven by a preponderance of the evidence that

1. Nationwide and Christine Lucarell entered into the Credit Agreement and Promissory Note

2. Nationwide performed its obligations under the Credit Agreement and Promissory Note

3. Christine Lucarell failed to satisfy her payment obligations under the Credit Agreement and Promissory Note, **and**

4. Nationwide suffered damages as a result of Christine Lucarell's failure to satisfy her payment obligations under the Credit Agreement and Promissory Note?

The jury answered "No."

**{¶153}** The jury also found that Nationwide was not entitled to payment on the Note because Nationwide prevented Lucarell from performing, fulfilling, and/or completing a condition that would have excused her from performance. (Jury Interrogatory No. 16).

**{¶154}** The jury's findings were that Nationwide's actions prevented Lucarell from being able to perform successfully in her agency and to pay off the Note. Therefore, it concluded Nationwide was not entitled to payment on the Note. This was not a simple case where one party defaulted on a note, so the other party was entitled to payment. Instead, it was within the jury's province to find that because Nationwide prevented Lucarell from successfully completing the AE Program, Nationwide prevented her from being able to repay the Note and, therefore, Nationwide was not entitled to payment. In any event, this was a damage allocation, akin to a set-off.

**{¶155}** Accordingly, Nationwide's tenth assignment of error is without merit.

**{¶156}** Nationwide's eleventh assignment of error states:

> THE TRIAL COURT ERRED BY AWARDING ATTORNEY'S FEES AND PREJUDGMENT INTEREST.

**{¶157}** The trial court awarded Lucarell $187,546.50 in attorneys' fees and $21,557.64 in expenses. (April 11, 2013 Judgment Entry). Additionally, the trial court awarded Lucarell prejudgment interest upon finding that Nationwide failed to act in good faith to settle the case. (July 29, 2013 Judgment Entry).

**{¶158}** In its final assignment of error, Nationwide argues that it is entitled to a judgment as a matter of law on Lucarell's tort claims. And because the tort claims

gave rise to these awards, the awards of attorneys' fees and prejudgment interest must be reversed.

**{¶159}** Generally, a party to a civil action may not recover attorney fees as part of the costs of litigation. *Wilborn v. Bank One Corp.*, 121 Ohio St. 3d 546, 2009-Ohio-306, 906 N.E.2d 396, ¶7. An exception exists, however, when the prevailing party demonstrates bad faith on the part of the unsuccessful litigant. *Id.*

**{¶160}** R.C. 1343.03(C) provides for prejudgment interest

[i]f, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case[.]

**{¶161}** Even though the trial court should not have allowed Lucarell's claims for constructive discharge and retaliation, that still leaves Lucarell's tort claim for invasion of privacy. Thus, Lucarell has still prevailed on one tort claim. Therefore, Nationwide's argument here fails.

**{¶162}** Accordingly, Nationwide's eleventh assignment of error is without merit.

### Lucarell's Cross Appeal

**{¶163}** Next, we must address Lucarell's cross-appeal. Lucarell raises three assignments of error in her cross-appeal, the first of which states:

WHETHER THE TRIAL COURT ERRED IN DISMISSING LUCARELL'S FRAUD CLAIM ON DIRECTED VERDICT.

**{¶164}** Lucarell raised a claim for fraud. On Nationwide's motion, the trial

court granted a direct verdict on that claim. (Tr. 1663). In so doing, the court found:

> There may have been poor judgment. There may have been poor calculations as far as what the expectations were for these agents, and it may fit into other causes of action that the plaintiff has brought, but not a fraud allegation here. The plaintiff has to prove there was a knowing misrepresentation of fact with the intent of Nationwide to have these people rely upon it to their detriment from the outset. And I think there came a time pursuant to what the evidence has shown here where even the defendant has, and the defendant's employees here and agents have admitted that perhaps there was a miscalculation and perhaps there was - - there were unrealistic demands that were put on these agents, but not a fraud under the court's analysis here.

(Tr. 1662-1663).

**{¶165}** When a trial court grants a directed verdict, it must construe the evidence most strongly in favor of the nonmoving party and find that reasonable minds could come to but one conclusion based on the evidence submitted and that conclusion is adverse to the nonmoving party. *City of Steubenville v. Schmidt*, 7th Dist. No.01 JE 13, 2002-Ohio-6894, ¶31, citing Civ.R. 50(A)(4). In ruling on a directed verdict motion, the court must not consider the weight of the evidence or the credibility of the witnesses. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St. 3d 677, 679, 1998-Ohio-602, 693 N.E.2d 271, quoting *Hawkins v. Ivy*, 50 Ohio St.2d 114, 115, 363 N.E.2d 367 (1977), *Kellerman v. J.S. Durig Co.*, 176 Ohio St. 320, 199 N.E.2d 562 (1964).

**{¶166}** The elements of fraud are: (1) a representation or a concealment of a fact where there is a duty to disclose; (2) that is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance; and (6) a resulting

injury proximately caused by the reliance. *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶47, citing *Gaines v. Preterm-Cleveland Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987). It is possible for a party to assert a fraud claim and breach of contract claim in the same action, if there is a duty owed by the breaching party that is separate from the breach of contract claim. *Strategy Grp. for Media, Inc. v. Lowden*, 5th Dist. 12 CAE 03 0016, 2013-Ohio-1330, ¶25.

**{¶167}** Lucarell asserts the evidence demonstrated that Nationwide fraudulently induced her to join the AE Program. She points to her testimony that sales manager Bill Helfer showed her a pro forma that led her to believe she would earn $200,000 per year in the AE Program. (Tr. 1265-1266). And she points to testimony from Nationwide's vice president of agency development that under the AE program, agents were having difficulty meeting their performance objectives and were undercapitalized and running out of money. (Tr. 716). She also points to testimony that Nationwide's sales managers' salary could be negatively affected if they failed to recruit the required number of new AE agents. (Tr. 562-564).

**{¶168}** Lucarell further asserts that Nationwide fraudulently altered her loan application. She points to her own testimony that the information on her loan application to Nationwide Bank was altered. (Tr. 486-488). And she points to Nationwide Federal Credit Union senior loan officer Michael Weisenburger's testimony. Weisenburger was the underwriter for Lucarell's loan. (Tr. 1890). Weisenburger testified that Nationwide's sales managers would send NFCU certified business plans and loan applications to him for loan approval. (Tr. 1888). Approximately a year after Lucarell entered into her loan, Weisenburger testified, Lucarell contacted him and asked him to look at the original loan documents and business plan. (Tr. 1891). Weisenburger stated that he and Lucarell compared the business plan to the one Lucarell had submitted and realized that changes had been made. (Tr. 1891). Weisenburger testified this "tipped" him and made him "aware - - that it was fraudulent information that was being sent up to help in order to get the loan approved." (Tr. 1892). He stated that the sales agents were under "severe,

severe pressure" to recruit agents. (Tr. 1892). He testified that when he realized what had happened with Lucarell's loan documents, he no longer accepted loan documents that came from Nationwide's sales managers. (Tr. 1893).

**{¶169}** As to her damages, Lucarell testified that she is no longer permitted to own her own insurance agency because she cannot qualify to purchase a business. (Tr. 1436).

**{¶170}** Nationwide points to evidence in the record that contradicts Lucarell's evidence. But as noted above, the trial court was not to weigh the evidence or judge the witnesses' credibility. *Texler*, 81 Ohio St. 3d at 679. Instead, it was to construe the evidence most strongly in Lucarell's favor as the nonmoving party. *Schmidt*, 7th Dist. No.01 JE 13, at ¶31.

**{¶171}** Given the above evidence and construing it in Lucarell's favor as we are required to do, we conclude that the trial court erred in granting a directed verdict on Lucarell's fraud claim. "If the record contains *any* competent evidence, when construed most strongly in favor of the nonmoving party, upon which reasonable minds could reach different conclusions, the court must deny the motion." (Emphasis added.) *Oyer v. Adler*, 4th Dist. No. 13CA3405, 2015-Ohio-1722, ¶13.

**{¶172}** From the above cited evidence, construed most strongly in Lucarell's favor, reasonable minds could find that Nationwide fraudulently induced Lucarell to join the AE program by leading her to believe she would earn $200,000 a year when it knew or should have known that its AE agents were failing. Additionally, reasonable minds could find that Nationwide fraudulently altered Lucarell's loan documents with the intent to mislead the NFCU loan underwriter into believing Lucarell's financial situation and business plan were different in order to improve the chances of NFCU approving the loan. Thus, the trial court should have allowed Lucarell's fraud claim to go to the jury.

**{¶173}** Accordingly, Lucarell's first assignment of error has merit.

**{¶174}** Lucarell's second assignment of error states:

WHETHER THE TRIAL COURT ERRED IN DENYING

PUNITIVE AND EMOTIONAL DAMAGES ON LUCARELL'S BREACH
OF CONTRACT CLAIMS.

**{¶175}** The trial court determined that Lucarell was not entitled to punitive damages on her breach of contract claims. (Tr. 2188). Lucarell objected. (Tr. 46-48, 2188).

**{¶176}** In this assignment of error, Lucarell contends that punitive damages are recoverable on a breach of contract claim when it is accompanied by a connected, but independent tort involving fraud. She claims she presented ample evidence of fraud.

**{¶177}** Punitive damages are generally not recoverable on a breach of contract claim, no matter how willful the breach. *Digital & Analog Design Corp. v. N. Supply Co.*, 44 Ohio St. 3d 36, 46, 540 N.E.2d 1358 (1989), citing *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922), paragraph two of the syllabus; *Wilms v. Lo-Mar Enterprises, Inc.*, 7th Dist. No. 83-C-39, 1985 WL 10417, at *3 (Apr. 11, 1985). But punitive damages may be available if the breach of contract is accompanied by a connected, but independent tort involving fraud, malice, or oppression. *Mabry-Wright v. Zlotnik*, 165 Ohio App. 3d 1, 2005-Ohio-5619, 844 N.E.2d 858, ¶19 (3d Dist.), citing *Goldfarb v. Robb Report, Inc.*, 101 Ohio App.3d 134, 140, 655 N.E.2d 211 (10th Dist.1995); *Wilms*, supra.

**{¶178}** As discussed in Lucarell's first assignment of error, the trial court erred when it granted a directed verdict on her fraud claim. Had the court allowed the fraud claim to go to the jury and had the jury returned a verdict in Lucarell's favor, then the jury may have also awarded punitive damages on the breach of contract claims because she would be entitled to present her claim for punitive damages.

**{¶179}** Accordingly, Lucarell's second assignment of error has merit.

**{¶180}** Lucarell's third assignment of error states:

WHETHER THE TRIAL COURT ERRED IN APPLYING R.C.
2315.21 TO LUCARELL'S RETALIATION CLAIM.

**{¶181}** The trial court found that R.C. 2315.18 applied to limit non-economic damages on Lucarell's retaliation claim to the greater of $250,000 or an amount equal to three times the economic loss with a cap at $350,000. It also found that R.C. 2315.21(D)(2)(a) applied to limit the punitive damages on Lucarell's retaliation claim to two times the compensatory damages. The trial court applied these statutory caps to the retaliation claim because it determined that the retaliation claim was a tort action. Applying these caps, the trial court reduced the non-economic damages award from $400,000 to $250,000 and reduced the punitive damages award from $11 million to $500,000. (January 31, 2013 Order Regarding Statutory Caps; July 29, 2013 Amended Judgment Entry).

**{¶182}** Lucarell asserts the trial court should have found that her retaliation claim was contractually-based, as it did with her constructive discharge and invasion of privacy claims, because it involved Nationwide's bad faith enforcement of its Credit Agreement and Promissory Note, which were derived from the other contracts entered into between the parties.

**{¶183}** Because we have determined that the trial court should not have allowed Lucarell's retaliation claim, this cross-assignment of error is moot.

### Conclusion

**{¶184}** Nationwide's first assignment of error asserting the trial court should have granted a JNOV on Lucarell's constructive discharge claim has merit. The court should not have allowed this claim to go to the jury. Likewise, Nationwide's second assignment of error asserting the trial court should have granted a JNOV on Lucarell's retaliation claim has merit. The court should not have allowed this claim to go to the jury either. Additionally, Nationwide's eighth assignment of error has merit in part because the trial court should not have allowed a punitive damage award on the invasion of privacy claim that exceeded the statutory cap. Lucarell's first cross assignment of error asserting the trial court erred in dismissing her fraud claim also has merit. The court should have allowed this claim to go to the jury. Finally, Lucarell's second cross assignment of error asserting the trial court erred in denying

punitive damages on her breach of contract claims has merit. Because the trial court should have allowed Lucarell's fraud claim to go the jury, it should have also allowed the jury to determine if punitive damages were warranted on Lucarell's breach of contract claims in the event the jury returned a verdict in Lucarell's favor on her fraud claim.

**{¶185}** The trial court's judgment is affirmed as to the breach of contract claims, the award of attorney fees, and prejudgment interest. The judgment is affirmed in part and reversed in part as to the invasion of privacy claim. The judgment is reversed as to the constructive discharge claim and the retaliation claim.

**{¶186}** The total compensatory damage award of $2.817 million is hereby reduced by $741,321.72, or 26.316% of the total compensatory damage award, which is that amount attributable to the constructive discharge claim. Therefore, Lucarell's total compensatory damage award is reduced to $2,075,678.28.

**{¶187}** The trial court's award of $10 in nominal damages and $100,000 in emotional distress damages on the invasion of privacy claim is affirmed.

**{¶188}** The award of $2 million in punitive damages on the invasion of privacy claim is reversed and reduced to $200,020 in order to comply with the statutory cap.

**{¶189}** The awards for non-economic damages, costs to defend against the counterclaim, and punitive damages on the retaliation claim are reversed and vacated. Likewise, the awards for punitive damages and non-economic damages on the constructive discharge claim are reversed and vacated.

**{¶190}** Lucarell's total compensatory damage award is $2,175,688.28, plus attorney fees and prejudgment interest. Lucarell's total punitive damage award is $200,020. Therefore, Lucarell's total award is $2,375,708.28, plus attorney fees and prejudgment interest.

**{¶191}** The trial court's judgment directing a verdict dismissing Lucarell's fraud claim is hereby reversed. This matter is remanded solely for the purpose of a new trial on Lucarell's fraud claim and punitive damages on her breach of contract claims, which can be awarded if the jury finds in Lucarell's favor on the fraud claim.

{¶192} For these reasons, the trial court's judgment is hereby affirmed in part, reversed in part, and remanded.

Waite, J., concurs.

Robb, J., concurs.